# IN THE SUPREME COURT OF IOWA

No. 13–0983

Filed April 3, 2015

**STATE OF IOWA,**

    Appellee,

vs.

**ARCHALETTA LATRICE YOUNG,**

    Appellant.

---

Appeal from the Iowa District Court for Polk County, Carol L. Coppola, Judge.

The defendant in a criminal proceeding appeals from an enhanced sentence imposed on her present conviction for third-degree theft by the use of a prior uncounseled misdemeanor conviction. **REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, John P. Sarcone, County Attorney, and Kevin D. Hathaway, Assistant County Attorney, for appellee.

**APPEL, Justice.**

In this case, we consider whether a misdemeanor conviction pursuant to a guilty plea by an incarcerated poor person who did not have the assistance of counsel, may later be used by the State as a predicate offense for application of a theft statute in which the crime is enhanced if the defendant has two prior theft offenses. The district court concluded the prior uncounseled misdemeanor conviction could be used as an offense to trigger enhanced punishment when the facts surrounding the prior conviction were that the defendant failed to appear; she was arrested and held in jail for one day prior to her initial appearance; and at the initial appearance, upon pleading guilty, she was sentenced to one day in jail, with credit for time served.

For the reasons expressed below, we conclude that under the right to counsel provision of article I, section 10 of the Iowa Constitution, a misdemeanor defendant has a right to the assistance of counsel when the defendant faces the possibility of imprisonment. Because the poor defendant in this case was not provided the assistance of counsel and the State stipulated there was not a valid waiver, the prior misdemeanor conviction cannot be used as a predicate offense to enhance a later punishment consistent with fundamental fairness demanded by the due process clause of article I, section 9 of the Iowa Constitution. As a result, we reverse the decision of the district court and remand for further proceedings.

### I. Factual and Procedural Background.

In June 2003, Archaletta Young was issued a citation for theft in the fifth degree for stealing $104.28 worth of merchandise from Walmart. *See* Iowa Code § 714.2(5) (2003). She failed to appear at her initial appearance, however, and the court issued a warrant for her arrest. At

her initial appearance, without counsel, Young pled guilty to theft in the fifth degree, a simple misdemeanor, and was sentenced to one day in jail with credit for time served and received a fine.

About nine-and-one-half years later, Walmart store security observed Young stealing $94.87 worth of clothing. The State filed a trial information alleging theft in the third degree under Iowa Code section 714.2(3) (2011).[1] This Code section provides: "the theft of any property not exceeding five hundred dollars in value by one who has before been twice convicted of theft, is theft in the third degree." *Id.* "Theft in the third degree is an aggravated misdemeanor." *Id.*

The State claimed Young was guilty of theft in the third degree based on her current crime and two prior theft convictions. One of the prior theft convictions that the State alleged supported theft in the third degree was Young's 2003 conviction of theft in the fifth degree. Young does not challenge the propriety of using the other prior fifth-degree-theft conviction as an enhancement predicate and thus no issues in this appeal are raised in connection with that conviction. However, under the statute, two prior fifth-degree-theft offenses are required to trigger the elevation of a subsequent fifth-degree-theft conviction to theft in the third degree.

Prior to trial, Young filed a motion to strike the 2003 prior theft conviction as a basis to support the charge of third-degree theft. In her motion, Young asserted that because she was not represented by counsel when she pled guilty and served a term of incarceration, the conviction was infirm under article I, sections 9 and 10 of the Iowa Constitution. As a result, Young argued the conviction could not be used to enhance her

---

[1]The second count of the two-count trial information charged Young with possession of a controlled substance in violation of Iowa Code section 124.401(5).

later crime. The State resisted, asserting that under applicable precedent, the uncounseled misdemeanor conviction could be used to enhance the later offense.

The trial court held a hearing on the issue. Young asked the court to judicially notice the content of the 2003 misdemeanor file, which the court agreed to do. The State recognized *State v. Allen*, 690 N.W.2d 684, 687 (Iowa 2005), stands for the proposition that a conviction cannot be used to enhance a later crime if the defendant was denied his or her constitutional right to counsel in the prior proceeding. The State contended, however, that Young had no right to counsel in the 2003 simple misdemeanor proceedings because realistically in these proceedings the defendant is given either a fine or credit for time served. The State further argued that in cases like Young's 2003 misdemeanor, a defendant would not benefit from counsel because no additional term of incarceration normally results after the entry of a guilty plea.

In rebuttal, Young noted that a client facing a simple misdemeanor conviction should be advised that the conviction could be used later to enhance a subsequent crime. She also asserted Iowa Rule of Criminal Procedure 2.19(9) supported her assertion that the uncounseled misdemeanor conviction could not be used to enhance her later crime.

The State responded that sentence enhancements are collateral matters that do not give rise to ineffective-assistance claims. The State further asserted that rule 2.19 does not create an independent right to counsel.

Upon the conclusion of oral argument, the court asked the parties to file briefs in support of their respective positions. Young repeated her assertion that in order for a conviction to serve as a basis for enhancement it must be constitutionally valid. Young claimed the 2003

simple misdemeanor could not be a predicate to enhancement because she did not have an attorney; did not waive her right to an attorney; was ultimately sentenced to a term of imprisonment, namely one day with credit for time served; and received a fine. As a result, Young claimed her 2003 conviction was constitutionally infirm and could not be used to support an enhanced charge in the case.

In response, the State conceded Young did not have an attorney and did not waive the right to have one. Citing *Allen*, 690 N.W.2d at 693, the State argued an uncounseled simple misdemeanor conviction may be used to enhance a later charge when the defendant was not *actually sentenced* to a term of incarceration. While the State recognized Young was incarcerated for one day for her failure to appear in court, the State argued that the incarceration for one day was not punishment for the underlying offense, but was designed to ensure the defendant's presence for the criminal proceedings. Thus, according to the State, the 2003 uncounseled simple misdemeanor conviction was not constitutionally defective.

The district court rejected Young's argument and found the one day of incarceration was not additional incarceration resulting from her guilty plea. Although Young cited the wrong rule of criminal procedure, the court cited Iowa Rule of Criminal Procedure 2.61(2) and concluded Young's situation was not one in which "the defendant face[d] the possibility of imprisonment" requiring the appointment of counsel under the rule.

Young waived a jury trial and stipulated to a trial on the minutes. The district court found Young guilty of theft in the third degree and possession of a controlled substance and sentenced Young to

consecutive suspended sentences of two years and two years of probation. Young appealed.

**II. Standard of Review.**

Constitutional issues are reviewed de novo, but when there is no factual dispute, review is for correction of errors at law. *State v. Majeres*, 722 N.W.2d 179, 181 (Iowa 2006). In interpreting the Iowa Rules of Criminal Procedure, our review is for correction of errors at law. *State v. Jones*, 817 N.W.2d 11, 15 (Iowa 2012).

**III. Discussion.**

**A. Preliminary Issues.** Several preliminary aspects of this case deserve attention. First, the State concedes that if the 2003 conviction was obtained in violation of Young's right to counsel, then the 2003 conviction cannot be used to enhance Young's 2012 offense. Second, the State concedes Young did not waive her right to counsel during the 2003 proceeding. Thus, if Young's 2003 conviction was obtained in violation of Young's right to counsel under the State or Federal Constitution, it cannot be used to enhance the 2012 offense.

There is also a potential preservation issue in this case. In the written motion to strike the enhancement, the defendant relied on *Allen*, 690 N.W.2d at 263, and the right-to-counsel and due process provisions of the Iowa Constitution. At oral argument and in postargument submissions, the defendant also cited the right-to-counsel and due process provisions of the United States Constitution. The district court order explicitly considered *Allen* and the Iowa Constitution, but did not address the question under the United States Constitution.

Even if there was a failure to preserve issues under the United States Constitution, such claims, and any other claim inartfully made or not preserved, could be resurrected under the aegis of an ineffective-

assistance-of-counsel claim. *See State v. Brubaker*, 805 N.W.2d 164, 170 (Iowa 2011) ("Failure of trial counsel to preserve error at trial can support an ineffective-assistance-of-counsel claim."). Because we conclude that under the Iowa Constitution, a defendant facing the possibility of imprisonment in a misdemeanor proceeding has a constitutional right to counsel, Young's uncounseled 2003 misdemeanor conviction cannot be used to enhance her 2012 crime. As a result, any failure to preserve the issue under the Federal Constitution or any other claim is of no consequence.

**B. Setting the Contextual Stage: Do Misdemeanor Convictions Matter?** Misdemeanors are by definition crimes less serious than felonies. *Compare Black's Law Dictionary* 736 (10th ed. 2014), *with id.* at 1150. An appeal involving an uncounseled misdemeanor may seem inconsequential, but there is more under the surface. Because of high volumes, the treatment of misdemeanors in the court system naturally tends to emphasize efficiency over accuracy of fact-finding. *See* John D. King, *Beyond "Life and Liberty": The Evolving Right to Counsel*, 48 Harv. C.R.-C.L. L. Rev. 1, 20 & n.124 (2013) [hereinafter King]. The notion that efficiency may trump individualized determinations in a busy courtroom is cause for concern, particularly when our legal system relies upon the accuracy of those determinations to support dramatically enhanced sentences for later crimes. Given the pressures of docket management, there is a risk that the ability of the system to function efficiently and at low cost, rather than the reliability of fact-finding, will shape judicial outcomes.

It is not only the need to process large volumes of cases that puts pressure on the system provided misdemeanor defendants, but the fact that misdemeanor defendants are often poor persons. *See* Erica J.

Hashimoto, *The Price of Misdemeanor Representation*, 49 Wm. & Mary L. Rev. 461, 482–83 (2007). Being poor has two important consequences for those accused of misdemeanors. While many misdemeanor defendants do not face pretrial incarceration, those that do face significant obstacles to the assertion of innocence. As Caleb Foote demonstrated decades ago, pretrial detention significantly and adversely impacts the truth-finding process by preventing effective assertion of defenses and increasing pressures to plead guilty as a matter of convenience. *See* Caleb Foote, *Vagrancy-Type Law and Its Administration*, 104 U. Pa. L. Rev. 603, 643–47 & n.162 (1956) (noting the lack of pretrial procedures and the speed of the judicial process as particularly problematic in the adjudication of misdemeanor-type cases); *see also* Candace McCoy, *Caleb was Right: Pretrial Decisions Determine Mostly Everything*, 12 Berkeley J. Crim. L. 135, 137–38 (2007).

In addition, poor people cannot afford lawyers. And lawyers can be important, even in misdemeanor cases. At least one often-cited study has shown that the odds of escaping criminal liability for misdemeanor defendants increase five-fold when the accused is represented by counsel. *See Argersinger v. Hamlin*, 407 U.S. 25, 36, 92 S. Ct. 2006, 2011, 32 L. Ed. 2d 530, 538 (1972) (citing American Civil Liberties Union, *Legal Counsel for Misdemeanants Preliminary Report* 1 (1970)). The combination of administrative pressures, pretrial detention in some cases, and the lack of the guiding hand of counsel, are powerful factors that may distort the lens of the fact-finding process in our misdemeanor courts. *See* Lawrence Herman, *The Right to Counsel in Misdemeanor Court* 16–30 (1974) [hereinafter Herman].

For these reasons, the risk of an inaccurate verdict in uncounseled misdemeanor cases is higher than in most felony prosecutions. *See*

Herman at 27 & n.61. Noting that every student of the misdemeanor process has observed that the risk of convictions in misdemeanor court is much higher than in felony court, a leading scholar decades ago found it no accident that the first case reversed by the United States Supreme Court for insufficient evidence was a misdemeanor case, *Thompson v. City of Louisville*, 362 U.S. 199, 206, 80 S. Ct. 624, 629, 4 L. Ed. 2d 654, 659 (1960). *See* Herman at 27.

These distortions alone are reason for concern, but such concerns about the accuracy of individual determinations of guilt in cases involving misdemeanors are magnified by the fact that the so-called "collateral consequences" of misdemeanor convictions are dramatically increasing. Conviction of misdemeanors, as discussed below, may impose a significant moral stigma and can substantially affect employment opportunities. According to a 2010 survey performed by the Society for Human Resource Management, seventy-three percent of employers conducted criminal background checks on all of their employees, with another nineteen percent performing background checks on selected employees. *See* John P. Gross, *What Matters More: A Day in Jail or a Criminal Conviction*, 22 Wm. & Mary Bill Rts. J. 55, 86 (2013) [hereinafter Gross] (citing Soc'y for Human Res. Mgmt., *Background Checking: Conducting Criminal Background Checks* 3 (2010) [hereinafter Soc'y for Human Res. Mgmt.], *available at* http://www.shrm.org/ research/surveyfindings/articles/pages/backgroundcheckcriminalcheck s.aspx). Fifty-one percent of respondent employers indicated that a nonviolent misdemeanor would be " 'somewhat influential' " in determining employment, while twenty-two percent indicated that it would be " 'very influential.' " *See id.* (quoting Soc'y for Human Res. Mgmt. at 5). The "Common Application" being completed by thousands

of high school seniors applying to colleges now requires disclosure of misdemeanor and felony convictions.  *See* Paul Marcus, *Why the United States Supreme Court Got Some (But Not a Lot) of the Sixth Amendment Right to Counsel Analysis Right*, 21 St. Thomas L. Rev. 142, 176–77 (2009) [hereinafter Marcus].  By way of further example, a misdemeanor battery conviction can lead to deportation, *Hernandez v. U.S. Att'y Gen.*, 513 F.3d 1336, 1339–40 (11th Cir. 2008), a marijuana conviction can lead to loss of student loan assistance for at least a year, 20 U.S.C. § 1091(r)(1) (2012), a low-level drug crime may lead to eviction from public housing for the individual and the entire family, 42 U.S.C. § 1437d(l)(6), a conviction of the misdemeanor of indecent conduct can lead to sex registration requirements, Iowa Code § 692A.103(1) (2015), and a misdemeanor conviction of eluding an officer may lead to suspension of a driver's license, Iowa Code § 321.209(7).  A misdemeanor conviction can also affect professional licensure, child custody, the right to possess a firearm, and eligibility for government assistance.  *See* King, 48 Harv. C.R.-C.L. L. Rev. at 23–34 (describing the "panoply of severe consequences" misdemeanants may suffer in relation to their misdemeanor convictions); *see also* Gross, 22 Wm. & Mary Bill Rts. J. at 80–87 (detailing collateral consequences of misdemeanor convictions); Jenny Roberts, *Why Misdemeanors Matter: Defining Effective Advocacy in the Lower Criminal Courts*, 45 U.C. Davis L. Rev. 277, 298–303 (2011) (same).  Collateral consequences have proliferated to the point that the American Bar Association Standards for Criminal Justice now recommends that each jurisdiction collect all the collateral consequences within one section of the criminal code for ease of access for lawyers and clients.  *See* ABA Standards for Criminal Justice: Collateral Sanctions

and Discretionary Disqualification of Convicted Persons 19–2.1, at 21 (3d ed. 2004).

Further, in the electronic age, a remote misdemeanor conviction is no longer practically obscure. A tech-savvy functionary or a decision-maker who hires investigative firms who specialize in unearthing such information can easily discover a misdemeanor conviction. *See* King, 48 Harv. C.R.-C.L. L. Rev. at 31. Such convictions can have great capacity to further close opportunities for poor persons who, because of their social-economic status, already have limited opportunities. *See id.* (For example, "[t]he uncounseled misdemeanor defendant who pleads guilty to shoplifting in Oregon in exchange for a small fine may be surprised years later when that conviction prevents her from getting a job in New York.").

The bottom line is that while the treatment of misdemeanor cases by our judicial system is not likely to generate a media frenzy or rivet the attention of the public, it does raise important issues for our criminal justice system and those directly affected by it. Although lacking dazzle and glitz, this case thrusts us into an inquiry as close to the heart of the legal system as that actually experienced by thousands of Iowans.

**C. Impact of Iowa Rule of Criminal Procedure 2.61(2).** Young suggests the use of her uncounseled conviction violates her due process rights because she has a rule-based right to counsel under Iowa Rule of Criminal Procedure 2.61(2). The United States Supreme Court has allowed a due process collateral attack on a conviction in an enhancement context based only on the denial of the *constitutional* right to counsel established in *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 796, 9 L. Ed. 2d 799, 805 (1963). *See Custis v. United States*, 511 U.S. 485, 496, 114 S. Ct. 1732, 1738, 128 L. Ed. 2d 517, 528

(1994).  As emphasized in *Custis*, the failure to appoint counsel for an indigent defendant amounted to "a unique constitutional defect."  *Id.* Thus, there is no federally cognizable due process attack based upon a mere rule violation.

Of course, we could come to a different conclusion applying state law.  The question of whether a rule violation provides a foundation preventing a conviction from triggering an enhanced sentence was considered in *State v. Johnson*, 38 A.3d 1270, 1276 (Me. 2012).  In *Johnson*, a defendant sought to collaterally attack a prior conviction in a sentence-enhancement context on the ground that although he was represented in the prior proceeding, he was not properly informed of his rights under a state rule of criminal procedure.  *See id.* (citing Me. R. Crim. P. 5(b)–(c)).  In that case, the Maine Supreme Court summarized the authorities as standing for the proposition that

> the right to collaterally attack a conviction that will enhance a new charge or sentence should be, for solid constitutional and policy reasons, limited to a claim that the defendant was deprived of the fundamental Sixth Amendment right to counsel.

*Id.* at 1275.  The *Johnson* court emphasized that expanding the basis for collaterally attacking sentences in the enhancement context beyond the *Custis* rule requiring a deprivation of the constitutional right to counsel would introduce chronic uncertainty and undermine the finality of criminal judgments.  *Id.* at 1278.  In a footnote, the *Johnson* court noted that at least eleven jurisdictions had adopted the *Custis* framework.  *See id.* at 1275 n.7 (citing *Camp v. State*, 221 S.W.3d 365, 369–70 (Ark. 2006); *People v. Padilla*, 907 P.2d 601, 606 (Colo. 1995) (en banc); *State v. Veikoso*, 74 P.3d 575, 580, 582 (Haw. 2003); *State v. Weber*, 90 P.3d 314, 318–20 (Idaho 2004); *State v. Delacruz,* 899 P.2d 1042, 1049 (Kan.

1995); *McGuire v. Commonwealth*, 885 S.W.2d 931, 937 (Ky. 1994); *People v. Carpentier*, 521 N.W.2d 195, 199–200 (Mich. 1994); *State v. Weeks*, 681 A.2d 86, 89–90 (N.H. 1996); *State v. Mund*, 593 N.W.2d 760, 761 (N.D. 1999); *State v. Boskind*, 807 A.2d 358, 360, 362–64 (Vt. 2002); *State v. Hahn*, 618 N.W.2d 528, 532, 535 (Wis. 2000)).

Some state cases go somewhat beyond the *Custis* approach in their application of state law. For example, in *State v. Maine*, 255 P.3d 64, 69 (Mont. 2011), the Montana Supreme Court was asked by the state to adopt the *Custis* rule, namely, that prior convictions used for enhancement may not be challenged under any constitutional theory except a *Gideon* violation, under Montana law. The Montana court, however, noted that "[w]e have long recognized, however, that Montana law may be more protective of individual rights than the floor established by federal law." *Id.* at 72. Ultimately, the Montana court, under the due process clause of the Montana Constitution, held that a defendant could attack a prior conviction in the context of a sentence enhancement not only when there was a *Gideon* violation, but also when there was ineffective assistance of counsel. *Id.* at 73. While the Montana court thus announced a rule beyond the federal caselaw, the court emphasized that the expansion of collateral challenges extended only to cases that were "constitutionally infirm." *Id.*

In another case, *Paschall v. State*, 8 P.3d 851, 913 n.2 (Nev. 2000) (per curiam), the Nevada Supreme Court likewise departed from *Custis*. The *Paschall* court noted that *Custis* "merely established the floor for federal constitutional purposes." *Id.* The *Paschall* court declined to apply the *Custis* limitations under Nevada law. *Id.* *Paschall*, however, involved a constitutional claim, namely, whether under the Nevada Constitution, a justice of the peace had authority to suspend certain

sentences. *Id.* at 913–15. Thus, the claim entertained in *Paschall,* like that in *Johnson,* was of constitutional dimension.

New Jersey has taken a different approach. In *State v. Hrycak,* 877 A.2d 1209, 1211 (N.J. 2005), the New Jersey Supreme Court considered whether a prior uncounseled conviction could count in a sentencing enhancement proceeding. The *Hrycak* court relied on prior precedent providing counsel for indigent misdemeanor defendants in " 'the sound administration of justice.' " *Id.* at 1215 (quoting *Rodriguez v. Rosenblatt,* 277 A.2d 216, 223 (N.J. 1971)). The court held that "a prior uncounseled DWI conviction of an indigent is not sufficiently reliable to permit increased jail sanctions under the enhancement statute." *Id.* at 1216.

For reasons similar to those outlined in *Johnson,* however, we decline to announce a rule today that prevents application of a prior conviction in an enhancement proceeding based upon a mere rule violation. While we are, of course, free to depart from *Custis* under the Iowa Constitution, we do not think the expansion of collateral attacks on prior convictions based upon nonconstitutional flaws makes sense. Nor do we think expansion of the right to counsel by this court in "the sound administration of justice" is the appropriate approach. *See id.* at 1215. We have considerable discretion in supervising the operation of the judicial branch, but we do not believe it extends so far as to allow us to collaterally attack convictions arising from guilty pleas not on direct appeal or in an action for postconviction relief, but in the context of the enhancement of a subsequent crime in which there is no error of constitutional dimension.

As a result, we are required to proceed to consider whether the use of an uncounseled conviction in a misdemeanor proceeding to enhance

punishment involves a violation of constitutional dimension, namely, the violation of the right to counsel.

**D. Textual Provisions of State and Federal Constitutional Provisions Regarding the Right to Counsel.** Two separate Iowa constitutional provisions are implicated in this case, the right to counsel under Iowa Constitution article I, section 10, and the due process clause under Iowa Constitution article I, section 9. As will be seen below, although two separate Iowa constitutional provisions are implicated, the issues tend to merge. If the failure to provide appointed counsel to a poor person in a misdemeanor case violates the right to counsel in article I, section 10, it would be fundamentally unfair under the due process clause of article I, section 9 to use that conviction to enhance a later crime. *Cf. State v. Becker*, 818 N.W.2d 135, 148 (Iowa 2012) (due process protects fundamental fairness in judicial proceedings); *State v. Nail*, 743 N.W.2d 535, 539 (Iowa 2007) (same).

We begin our substantive review of the right to counsel with a review of the language of the Sixth Amendment of the United States Constitution and what has previously been characterized as the "unique" language of article I, section 10 of the Iowa Constitution. *See McNabb v. Osmundson*, 315 N.W.2d 9, 13 (Iowa 1982). Although we decide this case based upon the Iowa Constitution, analysis of federal law provides context for our consideration and shows the important interplay between state and federal constitutional law in right-to-counsel and due process questions.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Article I, section 10 uses similar language but adds an important additional provision.

Specifically, article I, section 10 provides that "[i]n all criminal prosecutions, *and in cases involving the life, or liberty of an individual,* the accused shall have a right . . . to have the assistance of counsel." Iowa Const. art. I, § 10 (emphasis added). Unlike its federal counterpart, the Iowa provision is double-breasted. It has an "all criminal prosecutions" clause and a "cases" clause involving the life or liberty of an individual.

The language of the Sixth Amendment and article I, section 10 raise interpretive issues. Under both the United States Constitution and the Iowa Constitution, the question that arises in the context of this case is the meaning of the term "all criminal prosecutions." Does the phrase "all criminal prosecutions" literally mean every criminal prosecution, or does it mean something else? Is the term "all criminal prosecutions" broad enough to cover all misdemeanor cases, some misdemeanor cases, or none at all? Even if "all criminal prosecutions" includes misdemeanors, does it mean only that there is a right to retained counsel, or if you are poor, does it mean there is a right to appointed counsel?

In considering these questions under article I, section 10, it is important to note that the mere fact the phrase "all criminal prosecutions" is used in both the Federal and Iowa Constitutions does not bind us to follow the prevailing federal constitutional interpretation. We are free to follow or reject federal authority in interpreting our state constitution depending upon our view of the strength of the reasoning in the federal precedent. *See, e.g., State v. Short,* 851 N.W.2d 474, 481 (Iowa 2014) ("We may, of course, consider the persuasiveness of federal precedent, but we are by no means bound by it.").

In addition, under the Iowa Constitution but not the Federal Constitution, there are additional interpretive issues posed by the "cases" clause. What are we to make of the additional language in article I, section 10 of the Iowa Constitution, not found in the Sixth Amendment, which provides that the right to counsel extends not only to all criminal prosecutions but also to "cases involving the . . . liberty of an individual?" To what extent does the phrase help inform the meaning of the prior term, "all criminal prosecutions?" And, to what extent does the "cases" language expand the scope of the right to counsel in Iowa beyond the right to counsel found in the Sixth Amendment as interpreted by the United States Supreme Court?

Finally, there is a question of whether an uncounseled misdemeanor conviction that could not validly support incarceration can be used to increase imprisonment when the defendant commits a later crime. If the first conviction without a lawyer cannot be used to support a day in jail, how can that same conviction later be used to impose an additional term of incarceration when the defendant commits another crime?

**E. Scope of the Right to Counsel in Misdemeanor Cases Under State and Federal Constitutions.**

1. *Introduction.* We now turn to consider the scope of the right to counsel in misdemeanor cases. As indicated above, the question of the scope of the right to counsel in misdemeanor cases is critical in this case because of the relationship between the right to counsel in the 2003 proceeding and the use of the 2003 conviction to enhance the 2012 crime.

We begin with a discussion of the English common law precedent, the adoption of state constitutions with right-to-counsel provisions more

expansive than the English tradition, and early state court cases dealing with the right to counsel. Next, we examine the convoluted course of federal constitutional law regarding the right to counsel embraced in the Sixth Amendment. We then return to state court cases in examining the extent to which the serpentine federal precedent has influenced state constitutional law. Finally, we examine Iowa law regarding the right to appointed counsel under article I, section 10 of the Iowa Constitution.

As will be seen below, we conclude article I, section 10 should not be interpreted in a fashion similar to United States Supreme Court precedent that requires a poor person suffer "actual imprisonment" before being entitled to the appointment of counsel in misdemeanor cases. Under the Iowa Constitution, we conclude that a poor person has a right to appointed counsel when a statute authorizes imprisonment unless the defendant validly waives that right. Because Young was prosecuted under a statute that authorized imprisonment, was not provided appointed counsel, and did not validly waive that right, it would be fundamentally unfair under the due process clause of the Iowa Constitution to use that prior conviction to enhance her later crime.

2. *Early English traditions, the development of state constitutional provisions, and early state court right-to-counsel precedents.* English common law recognized a limited right to counsel. Interestingly, however, the English common law right to counsel extended to all misdemeanor cases, but not to felonies. *See* William M. Beaney, *The Right to Counsel in American Courts* 8–9 (1955) [hereinafter Beaney]; James J. Tomkovicz, *The Right to the Assistance of Counsel* 3 (2002) [hereinafter Tomkovicz]. At least one theory posits that the Crown's interest in felony prosecution was just too great to allow all felony defendants the right to assistance of counsel to gum up the Crown's

prosecutorial efforts. *See* Tomkovicz at 3–6 (describing competing theories regarding why misdemeanants were allowed counsel while felons were not). Indeed, it seems to have been thought that serious crimes threatened the existence of the monarchy itself. *See id.* at 3–4. It is also true that at common law, private individuals, not professional prosecutors, brought felony cases, so arguably denial of the right to counsel did not cause a substantial imbalance in the trial of the case. *See id.* at 2–3. As noted by Professor Tomkovicz, there was no likelihood that a highly skilled prosecutor would take advantage of a less skilled defendant. *Id.* at 5.

Over time, some common law judges adopted a more relaxed attitude to the ban. *See* Beaney at 10; Tomkovicz at 6–8. By 1747, Parliament enacted a provision providing for legal counsel to those impeached by the House of Commons for high treason. Tomkovicz at 8. Not until 1836 did Parliament eventually extend the right to counsel to all felonies. *Id.*

The colonial practice with respect to the right to counsel is not well understood. Often times, it appears trials were informal affairs prosecuted by private parties. *See id.* at 9. However by the beginning of the American Revolution, all of the colonies employed public prosecutors to pursue criminal charges. *See id.*

The advent of public prosecutors seemed to have increased interest in providing defendants with the right to assistance of counsel. *See id.* at 9–10. For instance, the Delaware Charter of 1701 granted " 'all Criminals . . . the same Privileges of Witnesses and Council as their Prosecutors.' " *Id.* at 10 (quoting Del. Charter of 1701, § V). The Pennsylvania Charter of Privileges of 1701 had a similar provision. *Id.* (citing Pa. Charter of Privileges of 1701, § V). Connecticut as a matter of

common law seems to have rejected the English limitations on the right to counsel. Beaney at 16; Tomkovicz at 13. A number of the colonies provided for statutory rights to counsel of varying shapes and sizes. Some of the statutes not only allowed for representation by retained counsel, but also provided lawyers to the accused who wanted legal representation. *See* Beaney at 16, 21.

Seven of the early state constitutions provided a right to counsel. *See* Tomkovicz at 11. *See generally* Beaney at 19–21 (describing the right to counsel in early state constitutions). The Maryland Constitution of 1776 provided that "in all criminal prosecutions, every man hath a right . . . to be allowed counsel . . . ." Md. Const. of 1776, Declaration of Rights, art. XIX. The New Jersey Constitution of 1776 provided that "all criminals shall be admitted to the same privileges of witnesses and counsel, as their prosecutors are or shall be entitled to." N.J. Const. of 1776, art. XVI. The New York Constitution of 1777 stated that "in every trial on impeachment, or indictment for crimes or misdemeanors, the party impeached or indicted shall be allowed counsel, as in civil actions." N.Y. Const. of 1777, art. XXXIV. The Vermont Constitution of 1777 declared that "in all prosecutions for criminal offenses, a man hath a right to be heard, by himself and his counsel . . . ." Vt. Const. of 1777, ch. I, § X. The Massachusetts Constitution of 1780 provided that "every subject shall have a right to . . . be fully heard in his defence by himself, or his counsel at his election." Mass. Const. of 1780, pt. I, art. XII. The New Hampshire Constitution of 1784 provided that "[e]very subject shall have a right . . . to be fully heard in his defence, by himself, and counsel." N.H. Const. of 1784, pt. I, art. XV. The Delaware Constitution of 1792 provided that "[i]n all criminal prosecutions the accused hath a right to be heard by himself and his counsel." Del. Const. of 1792, art. I,

§ 7. Eventually, all state constitutions except Virginia had a right-to-counsel provision of some kind, and the Virginia courts eventually held that the right to counsel was incorporated by other state constitutional provisions. *See* David Fellman, *The Right to Counsel Under State Law*, 1955 Wis. L. Rev. 281, 281 & n.2 (1955).

The language of these early state constitutional provisions was plainly more expansive than the prevailing English practice. The use of the term "all criminal prosecutions" was obviously designed to address the gap in English law refusing to allow the right to counsel for felonies. *See* Tomkovicz at 14 ("[T]he states had dramatically departed from the restrictive English common law rule regarding retention of counsel in serious criminal prosecutions."). Beyond this conclusion, scholars have not uncovered much evidence of what state constitutional framers meant when adopting the broadly worded right to counsel language in the early state constitutions.

The state constitutional cases regarding the right to counsel are few and far between each other and do not represent the development of a coherent, organized body of law. Significantly, the Iowa Territorial Supreme Court and other state supreme courts decided in early cases that if a person was entitled to representation by counsel but could not pay for it, representation should be provided at state expense. *See Hall v. Washington County*, 2 Greene 473, 476 (Iowa 1850) (holding a county is liable for compensation to an attorney appointed by the court to conduct the defense of an indigent prisoner); *see also People v. Goldenson*, 19 P. 161, 168 (Cal. 1888); *Cutts v. State*, 45 So. 491, 491 (Fla. 1907); *Delk v. State*, 26 S.E. 752, 753 (Ga. 1896); *Hendryx v. State*, 29 N.E. 1131, 1132 (Ind. 1882); *Carpenter v. County of Dane*, 9 Wis. 274, 277 (1859). Further, well prior to the development of the United States

Supreme Court's doctrine of ineffective assistance of counsel, state courts were instrumental in chipping away at the theory that because an attorney was an agent of the client, the client could not bring an ineffectiveness claim. *See generally* Sara Mayeux, *Ineffective Assistance of Counsel Before* Powell v. Alabama*: Lessons from History for the Future of the Right to Counsel,* 99 Iowa L. Rev. 2161, 2162–84 (2014) (describing state caselaw from the 1880s through the 1920s regarding the foundations of current ineffective-assistance claims). Against this state court backdrop, the United States Supreme Court decided *Powell v. Alabama,* 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932), and *Gideon,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799.

3. *The Sixth Amendment and early federal constitutional law.* The United States Constitution originally, of course, did not contain a bill of rights, which was added to the document in 1791. When James Madison introduced language regarding the right to counsel as part of his proposed bill of rights, there seems to have been no substantive debate. *See* Beaney at 23–24. Like the earlier state constitutional provisions, it seems clear, however, the use of the term "all criminal prosecutions" was designed to fill the gaps in English common law and thus should generally be considered an expansive term.

Beyond that, according to one leading commentator, the founders seem to have left the matter of scope of the right to counsel to the courts. *See id.* at 25. Maybe so, but the Supreme Court did not consider any substantial case involving the right to counsel until the twentieth century. Part of the reason seems to be that states enacted statutes providing for the appointment of counsel in capital cases if not in all felony cases generally. Further, conscientious courts may have often found volunteer lawyers to assist the poor. *See id.* at 32.

4. *The evolution of federal constitutional law:* Powell, Gideon, *and beyond.* We begin our discussion of the modern right to counsel and its due process implications with a discussion of the infamous Scottsboro case, in which nine African-American youth were accused of raping two white girls, a capital offense. *See Powell*, 287 U.S. at 49, 53 S. Ct. at 57, 77 L. Ed. at 160. The accused were tried and convicted in state court and therefore, although the Sixth Amendment did not apply directly to the proceedings, the Due Process Clause of the Fourteenth Amendment was fully applicable. *Id.* at 60, 53 S. Ct. at 60, 77 L. Ed. at 166. The United States Supreme Court reversed the convictions on the ground that poor defendants in a capital case were entitled, as a matter of due process under the Fourteenth Amendment, to effective assistance of counsel at state expense. *Id.* at 71–72, 53 S. Ct. at 65, 77 L. Ed. at 172. In *Powell*, Justice Sutherland eloquently spoke of the role of counsel in defending poor defendants facing prosecution for capital crimes. He memorably wrote:

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Id.* at 68–69, 53 S. Ct. at 64, 77 L. Ed. at 170. The central theme of Justice Sutherland's opinion was the lack of reliability of convictions obtained without the assistance of counsel.

Justice Sutherland further noted that "[i]n a case such as this . . . the right to have counsel appointed, when necessary, is a logical corollary from the constitutional right to be heard by counsel." *Id.* at 72, 53 S. Ct. at 65, 77 L. Ed. at 172. In other words, if there is a due process right to retained counsel, there is also a due process right to appointed counsel when a defendant cannot pay for retained counsel.

The fresh and clean rhetoric of Justice Sutherland inspired judges and lawyers then, just as it inspires judges and lawyers today. What is not generally recognized, however, is that Justice Sutherland in *Powell* built his opinion largely on state court precedents, relying extensively on such precedents for the central propositions of the case, namely that pro forma participation of counsel does not satisfy the right to counsel, *id.* at 58–59, 53 S. Ct. at 60, 77 L. Ed. at 165 (citing thirteen state court precedents), that the right to counsel is fundamental in character, *id.* at 70–71, 53 S. Ct. at 64–65, 77 L. Ed. at 171 (citing eight state court cases), and that the right to have counsel appointed when necessary is a logical corollary from the constitutional right to be heard by counsel, *id.* at 72, 53 S. Ct. at 65, 77 L. Ed. at 172. Although they are less well known than United States Supreme Court precedents like *Powell,* state court right-to-counsel decisions did much of the ice-breaking that allowed *Powell* to sail into the law books.

Six years after *Powell,* the Court in *Johnson v. Zerbst,* 304 U.S. 458, 459, 58 S. Ct. 1019, 1020, 82 L. Ed. 1461, 1464 (1938), considered whether the Sixth Amendment required counsel be appointed for indigents in federal felony cases. In *Zerbst,* the defendants were accused

with feloniously possessing and uttering counterfeit money. *Id.* at 459–60, 58 S. Ct. at 1021, 82 L. Ed. at 1464. They had no lawyer and were tried and convicted without the assistance of counsel. *Id.* at 460, 58 S. Ct. at 1021, 82 L. Ed. at 1464. Because *Zerbst* was tried in federal court, the Sixth Amendment applied directly to the proceeding. *See id.* at 463, 58 S. Ct. at 1022–23, 82 L. Ed. at 1466.

In *Zerbst,* the Supreme Court firmly declared that a criminal defendant in federal court has a right to counsel and that if the defendant could not afford counsel, counsel would be provided. *Id.* The *Zerbst* Court underscored the point by characterizing the question in jurisdictional terms. *Id.* at 467–68, 58 S. Ct. at 1024, 82 L. Ed. at 1468. Representation by counsel was "an essential jurisdictional prerequisite to a federal court's authority to deprive an accused of his life or liberty." *Id.* The *Zerbst* Court declared that "[t]he Sixth Amendment withholds from federal courts, in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he has or waives the assistance of counsel." *Id.* at 463, 58 S. Ct. at 1022–23, 82 L. Ed. at 1466 (footnote omitted). The *Zerbst* Court emphatically characterized the failure to provide counsel as a "jurisdictional bar" to a valid conviction depriving the defendant of his life or liberty. *Id.* at 468, 58 S. Ct. at 1024, 82 L. Ed. at 1468.

The *Zerbst* Court further emphasized that the Sixth Amendment embodies

> a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel. That which is simple, orderly, and necessary to the lawyer—to the untrained laymen—may appear intricate, complex, and mysterious.

*Id.* at 462–63, 58 S. Ct. at 1022, 82 L. Ed. at 1465–66. As in *Powell*, the central theme of *Zerbst* was the lack of reliability of verdicts obtained without the assistance of counsel.

The Supreme Court next returned to considering a right-to-counsel issue in a state court proceeding in *Betts v. Brady*, 316 U.S. 455, 456–57, 62 S. Ct. 1252, 1253, 86 L. Ed. 1595, 1599 (1942), *overruled by Gideon*, 372 U.S. at 339, 83 S. Ct. at 794, 9 L. Ed. 2d at 802. In *Betts*, a defendant accused of robbery in a Maryland court was denied appointment of counsel. *Id.* The defendant subsequently pled not guilty and elected to be tried to the court. *Id.* at 457, 62 S. Ct. at 1253–54, 86 L. Ed. at 1599. The defendant summoned witnesses on his behalf, cross-examined the State's witnesses, and examined his own. *Id.* at 457, 62 S. Ct. at 1254, 86 L. Ed. at 1599. He did not take the stand on his own behalf and was convicted by the trial court. *Id.* The conviction was upheld upon filing a writ of habeas corpus. *Id.* The United States Supreme Court granted certiorari and affirmed. *Id.* at 473, 62 S. Ct. at 1262, 86 L. Ed. at 1607.

The *Betts* Court emphasized that while the Sixth Amendment applies to trials in federal courts, it is only through the Due Process Clause of the Fourteenth Amendment that a defendant may make a claim from a state court conviction. *Id.* at 461–62, 62 S. Ct. at 1256, 86 L. Ed. at 1601. According to *Betts*, the Due Process Clause does not incorporate lock, stock, and barrel the entirety of the Sixth Amendment. *Id.* Instead, due process is much more flexible and fact specific. *Id.* According to the *Betts* Court, only "in certain circumstances" would the denial of right to counsel by a state court amount to a due process violation under the Fourteenth Amendment. *Id.* The *Betts* Court noted "states should not be straight-jacketed . . . by a construction of the

Fourteenth Amendment" advanced by the appellants. *Id.* at 472, 62 S. Ct. at 1261, 86 L. Ed. at 1607. Thus, federalism concerns were an important factor in achieving a different result than in *Zerbst.* With regard to whether a poor defendant was entitled to appointed counsel for felony cases in state court, the *Betts* Court declared that no definite criteria could be developed, but that the totality of circumstances needed to be evaluated, which included the nature of the crime, the age and education of the defendant, the conduct of the court and prosecuting officials, and the complicated nature of the offense charged and possible defenses related to the charge. *Id.* at 472–73, 62 S. Ct. at 1261–62, 86 L. Ed. at 1607. The powerful and unequivocal emphasis in *Powell* and *Zerbst* on the lack of reliability of uncounseled convictions gave way to a diluted view of the right to counsel powered by federalism concerns.

Justice Black called out the majority for its departure from the emphasis on the lack of reliability of uncounseled convictions. *Id.* at 474–77, 62 S. Ct. at 1262–63, 86 L. Ed. at 1607–09 (Black, J., dissenting). According to Justice Black, "[a] practice cannot be reconciled with common and fundamental ideas of fairness and right, which subjects innocent men to increased dangers of conviction merely because of their poverty." *Id.* at 476, 62 S. Ct. at 1263, 86 L. Ed. at 1609 (internal quotation marks omitted). Justice Black cited the Supreme Court of Wisconsin, which in the case of *Carpenter* declared that it would make a " 'mockery to secure to a pauper . . . solemn constitutional guaranties for a full and fair trial [and then state] he must employ his own counsel.' " *Id.* (quoting *Carpenter,* 9 Wis. at 276). In support of his dissent, he attached a lengthy appendix showing that many states were providing counsel to indigents on a categorical basis. *Id.* at 477–80, 62 S. Ct. at 1264–65, 86 L. Ed. at 1609–11. Although not expressed in

these terms, Justice Black essentially argued that the majority approached the application of Sixth Amendment right to counsel in state courts in lowest-common-denominator terms.

Aside from Justice Black's protest regarding the abandonment of the underlying rational of the right to counsel, the multifactored special-circumstances test in *Betts* was unstable and encountered some resistance in the lower courts as judges routinely found special circumstances. *See* Christine S. May, *Uncounseled Misdemeanor Convictions and Their Unreliability for Sentence Enhancement Under the United States Federal Sentencing Guidelines:* Nichols v. United States, 114 S. Ct. 1921 (1994), 18 Hamline L. Rev. 231, 238 & n.86 (1994) [hereinafter May] (citing cases). An everything-is-relevant and nothing-is-determinative test produces wide fluctuations in results. Twenty years later, in *Gideon, Betts* was overruled, the principle of *Powell* was extended to noncapital felony prosecutions, and parity between the Sixth Amendment right to appointed counsel in federal and state courts was restored. *Gideon,* 372 U.S. at 345, 83 S. Ct. at 797, 9 L. Ed. 2d at 805–06.

The facts of *Gideon* are well known. Gideon was charged with breaking and entering a poolroom with intent to commit a misdemeanor, a felony under Florida law. *Id.* at 336, 83 S. Ct. at 792, 9 L. Ed. 2d at 800–01. He sought appointed counsel, but the trial court advised him that counsel could be appointed only in capital cases. *Id.* at 337, 83 S. Ct. at 792, 9 L. Ed. 2d at 801. He attempted to defend himself, giving an opening statement, cross-examining witnesses, and making a closing statement. *Id.* at 337, 83 S. Ct. at 792–93, 9 L. Ed. 2d at 801. He was found guilty and received a five-year sentence. *Id.* The Supreme Court reversed, holding that the right to counsel in criminal proceedings such

as that faced by Gideon was fundamental to a fair trial. *Id.* at 344, 83 S. Ct. at 796, 9 L. Ed. 2d at 805.

As in *Powell* and *Zerbst*, the animating principle behind *Gideon* was that the " 'guiding hand of counsel' " was essential in fairly determining the outcomes of cases in the criminal justice system. *Id.* at 344, 83 S. Ct. at 797, 9 L. Ed. 2d at 805 (quoting *Powell*, 287 U.S. at 68–69, 53 S. Ct. at 64, 77 L. Ed. at 170). As noted by Justice Black, "[r]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." *Id.* at 344, 83 S. Ct. at 796, 9 L. Ed. 2d at 805. The Court in *Gideon* characterized *Betts* as an "abrupt break" from previous precedent and *Gideon* "restore[d] constitutional principles established to achieve a fair system of justice." *Id.*

While the underlying rationale of *Powell* and *Gideon* applied to all criminal prosecutions, the holding in *Powell* applied only to capital offenses and in *Gideon* to felonies. *Gideon*, 372 U.S. at 342, 345, 83 S. Ct. at 795, 797, 9 L. Ed. 2d at 801, 805–06; *Powell*, 287 U.S. at 71, 53 S. Ct. at 65, 77 L. Ed. at 171–72. Yet, *Gideon* made short work of the claim that capital offenses should be distinguished from felonies, focusing not on the severity of the crime but the need for fundamental fairness in the underlying proceeding. 372 U.S. at 344, 83 S. Ct. at 796, 9 L. Ed. 2d at 805. Further, although state attorneys' general in their amicus brief urged the court to limit the right to appointed counsel to felonies, the court declined to do so. *Id.* at 344–45, 83 S. Ct. at 796–97, 9 L. Ed. 2d at 805 (holding only that refusal to appoint counsel for an indigent accused of a noncapital felony violated the Due Process Clause); *see* Brief for the State Government Amici Curiae, *Gideon v. Wainwright*, 372 U.S. 335

(1963) (No. 155), 1962 WL 115122, at *3, *21 ("We repeat that we are limiting our claim to the constitutional right to representation for felonies."); Henry Clay Moore, Comment, *The Right to Counsel for Misdemeanants in State Courts*, 20 Ark. L. Rev. 156, 158 (1966). Yet, under *Gideon*, the question of whether the Sixth Amendment required the appointment of counsel to assist the poor in misdemeanor prosecutions remained an open question. Plainly, however, in *Gideon* the dilution of Sixth Amendment rights in state court as evidenced in *Betts* was abandoned in favor of the traditional rationale of the lack of reliability of uncounseled convictions.

The United States Supreme Court in *Burgett v. Texas*, 389 U.S. 109, 88 S. Ct. 258, 19 L. Ed. 2d 319 (1967), considered the question of whether an uncounseled conviction in state court could be used to enhance the penalties of a later criminal conviction. Burgett was convicted of assault with malice aforethought with intent to murder. *Id.* at 110, 88 S. Ct. at 259, 19 L. Ed. 2d at 322. Pursuant to a Texas recidivist statute, however, he faced life in prison if he had incurred four previous felony convictions. *Id.* at 111, 88 S. Ct. at 260, 19 L. Ed. 2d at 322. Three of the convictions were for forgery in Tennessee. *Id.* During trial, the state offered into evidence a certified copy of one of the Tennessee convictions, which indicated that the defendant proceeded "without Counsel." *Id.* at 112, 88 S. Ct. at 260, 19 L. Ed. 2d at 323 (internal quotation marks omitted). The State then offered a second version indicating there was "argument of counsel." *Id.* (internal quotation marks omitted). The question posed was whether an uncounseled felony conviction could be used to enhance the punishment for a later crime. *Id.* at 115–16, 88 S. Ct. at 262, 19 L. Ed. 2d at 324–25.

In an opinion by Justice Douglas, the Supreme Court held that the prior Tennessee conviction could not be used to support the enhancement. *Id.* The *Burgett* Court announced that

> [t]o permit a conviction obtained in violation of *Gideon v. Wainwright* to be used against a person either to support guilt or enhance punishment for another offense is to erode the principle of that case. Worse yet, since the defense in the prior conviction was denial of the right to counsel, the accused in effect suffers anew from the deprivation of that Sixth Amendment right.

*Id.* at 115, 88 S. Ct. at 262, 19 L. Ed. 2d at 324–25 (citation omitted). Justice Warren returned to the theme of lack of reliability of uncounseled convictions, noting the case presented "a classic example of how a rule eroding the procedural rights of a criminal defendant on trial for his life or liberty can assume avalanche proportions, burying beneath it the integrity of the fact-finding process." *Id.* at 117, 88 S. Ct. at 263, 19 L. Ed. 2d at 326 (Warren, C.J., concurring). As with the other right-to-counsel cases except for the overturned *Betts*, the focus was on the lack of reliability of the fact-finding process when a defendant is convicted without the assistance of counsel.

In reaching its decision, the Court seemed to put the burden on the state to show that the defendant either received the assistance of counsel or validly waived his or her right to counsel in the prior proceeding. *See id.* at 114–15, 88 S. Ct. at 262, 19 L. Ed. 2d at 324 (majority opinion). According to the *Burgett* Court, presuming waiver of counsel from a silent record was impermissible. *Id.*

The high court considered a similar question in *United States v. Tucker*, 404 U.S. 443, 446, 92 S. Ct. 589, 591, 30 L. Ed. 2d 592, 595–96 (1972). In *Tucker*, a federal court imposed a sentence relying in part upon uncounseled felony convictions. *Id.* at 444–45, 92 S. Ct. at 590, 30

L. Ed. 2d at 594–95. The Supreme Court remanded the case to the trial court with instructions to reconsider the sentence. *Id.* at 448–49, 92 S. Ct. at 592–93, 30 L. Ed. 2d at 597. Citing *Burgett,* the Court emphasized that the use of an unconstitutionally obtained felony conviction would erode the principle of *Gideon. Id.* (citing *Burgett,* 389 U.S. at 115–16, 88 S. Ct. at 262, 19 L. Ed. 2d at 324–25). The *Tucker* Court emphasized that the trial court acted upon "misinformation of constitutional magnitude." *Id.* at 447, 92 S. Ct. at 592, 30 L. Ed. 2d at 596. In a footnote, the *Tucker* Court further cited *Gideon* for the proposition that a lawyer's help is necessary to ensure that the poor receive a fair trial. *Id.* at 447 n.5, 92 S. Ct. at 592 n.5, 30 L. Ed. 2d at 596–97 n.5 (citing *Gideon,* 372 U.S. at 344, 83 S. Ct. at 796, 9 L. Ed. 2d at 805). *Tucker* therefore remained consistent with the underlying reliability theme of *Powell, Zerbst, Gideon,* and *Burgett.*

In *Loper v. Beto,* 405 U.S. 473, 483–84, 92 S. Ct. 1014, 1019–20, 31 L. Ed. 2d 374, 381–82 (1972) (plurality opinion), the Supreme Court for a third time refused to allow an uncounseled conviction, invalid under *Gideon,* to have collateral consequences. In *Loper,* the Supreme Court considered a habeas corpus claim in which a state court defendant argued it was improper for Texas prosecutors to attempt to impeach him using an uncounseled state court felony conviction. *Id.* at 476–78, 92 S. Ct. at 1016–17, 31 L. Ed. 2d at 378–79. The Supreme Court refused to allow such impeachment. *Id.* at 483–84, 92 S. Ct. at 1019–20, 31 L. Ed. 2d at 381–82. According to Justice Stewart's plurality opinion, " 'the absence of counsel impairs the reliability of [uncounseled] convictions just as much when used to impeach as when used as direct proof of guilt.' " *Id.* at 483, 92 S. Ct. at 1019, 31 L. Ed. 2d at 382 (quoting *Gilday v. Scafati,* 428 F.2d 1027, 1029 (1st Cir. 1970)). The reliability rationale

of *Powell, Zerbst, Gideon, Burgett,* and *Tucker* was at the heart of the opinion.

After *Gideon,* the question remained whether the right to counsel extended to misdemeanor prosecutions. Several federal appellate courts who considered the question after *Gideon* held that under the Sixth Amendment, a poor defendant was entitled to the appointment of counsel in misdemeanor cases. *See, e.g., Harvey v. Mississippi,* 340 F.2d 263, 269 (5th Cir. 1965); *Evans v. Rives,* 126 F.2d 633, 639 (D.C. Cir. 1942). The Court of Appeals for the Fifth Circuit in *Harvey* noted that while the key right to counsel cases involved felonies, "their rationale does not seem to depend on the often purely formal distinction between felonies and misdemeanors." 340 F.2d at 269. The Court of Appeals for the D.C. Circuit in *Evans* emphasized that no differentiation is made in the term "all criminal prosecutions" in the Sixth Amendment. 126 F.2d at 638.

The Supreme Court first took up the issue of the application of *Powell* and *Gideon* principles to misdemeanor cases in *Argersinger,* 407 U.S. at 26–27, 92 S. Ct. at 2007–08, 32 L. Ed. 2d at 532–33. In *Argersinger,* a divided Florida Supreme Court ruled that the notion that a poor person was entitled to appointed counsel did not extend to cases in which punishment did not exceed six months' imprisonment. *Id.* at 26–27, 92 S. Ct. at 2007, 32 L. Ed. 2d at 532–33. Because the defendant in *Argersinger* was sentenced to only ninety days in jail, the Florida Supreme Court majority concluded that *Gideon* and *Powell* did not apply. *Id.*

The Supreme Court reversed. *Id.* at 27, 92 S. Ct. at 2008, 32 L. Ed. 2d at 533. In an opinion by Justice Douglas, the Court rejected the proposition that principles of *Powell* and *Gideon* did not extend to crimes punishable by imprisonment for less than six months. *Id.* at 32–

33, 92 S. Ct. at 2010, 32 L. Ed. 2d at 535–36. Although the right to a jury trial might be restricted to cases involving six months or more of incarceration, Justice Douglas wrote that nothing in the history of the right to counsel suggested a similar limitation. *Id.* at 29–34, 92 S. Ct. at 2009–11, 32 L. Ed. 2d at 534–37. Justice Douglas noted that cases involving short-term imprisonment may bristle with thorny constitutional questions that require the defendant receive the assistance of counsel in order to receive a fair trial. *Id.* at 33, 92 S. Ct. at 2010, 32 L. Ed. 2d at 536. Justice Douglas further noted that counsel is needed in misdemeanor as well as felony cases "so that the accused may know precisely what he is doing, so that he is fully aware of the prospect of going to jail or prison, and so that he is treated fairly by the prosecution." *Id.* at 34, 92 S. Ct. at 2011, 32 L. Ed. 2d at 536–37. While recognizing the volume of misdemeanor cases, Justice Douglas cautioned against "an obsession for speedy dispositions, regardless of the fairness of the result," *id.* at 34, 92 S. Ct. at 2011, 32 L. Ed. 2d at 537, and noted there was evidence in empirical studies that misdemeanant defendants are prejudiced from "assembly-line justice" when appointed counsel is not provided, *id.* at 36, 92 S. Ct. at 2012, 32 L. Ed. 2d at 538 (internal quotation marks omitted). Although Justice Douglas thus extended the fundamental fairness reasoning of *Powell* and *Gideon* to misdemeanors when a defendant was subsequently incarcerated, he expressly stated that the court "need not consider" whether the right to counsel applied when the "loss of liberty" is not involved. *Id.* at 37, 92 S. Ct. at 2012, 32 L. Ed. 2d at 538. Yet, plainly, in terms of its underlying rationale, *Argersinger* adopted the reliability rationale of *Powell* and its long list of progeny.

Justice Powell, joined by Justice Rehnquist, filed a concurring opinion in *Argersinger*. *Id.* at 44–66, 92 S. Ct. at 2016–27, 32 L. Ed. 2d at 542–55 (Powell, J., concurring in the result). Justice Powell urged a more flexible, *Betts*-like, case-by-case approach to the question of the entitlement of a poor person to appointed counsel when facing a crime that was not a felony. *See id.* at 62–63, 92 S. Ct. at 2025, 32 L. Ed. 2d at 553. Thus, in some respects, Justice Powell thought the *Argersinger* majority went too far in extending the right to appointed counsel. *See id.*

However, Justice Powell thought the majority opinion fell too short as well. For instance, Justice Powell noted that the impact of a misdemeanor conviction on employment could present a serious consequence justifying the appointment of counsel. *Id.* at 47–48, 92 S. Ct. at 2017–18, 32 L. Ed. 2d at 544–45. Further, he noted that stigma may attach to a drunken-driving conviction and that losing a driver's license may be more serious for some individuals than a brief stay in jail. *Id.* at 48, 92 S. Ct. at 2018, 32 L. Ed. 2d at 544. In footnote 11, Justice Powell cited a wide range of potential collateral consequences, as well as academic literature related to them. *Id.* at 48 n.11, 92 S. Ct. at 2018 n.11, 32 L. Ed. 2d at 545 n.11. In short, in Justice Powell's view in 1972, the collateral effects of a misdemeanor conviction "are frequently of sufficient magnitude not to be casually described by the label 'petty.' " *Id.* at 48, 92 S. Ct. at 2018, 32 L. Ed. 2d at 544.

Whether the right to counsel extended to cases in which imprisonment was authorized by the underlying criminal statute, but did not actually occur, was considered by the United States Supreme Court in *Scott v. Illinois*, 440 U.S. 367, 368, 99 S. Ct. 1158, 1159, 59 L. Ed. 2d 383, 385–86 (1979). In *Scott*, the Illinois Supreme Court declined to extend *Argersinger* to cases in which no imprisonment was actually

imposed upon the defendant. *Id.* at 369, 99 S. Ct. at 1160, 59 L. Ed. 2d at 386.

The short 5–4 majority opinion in *Scott* was written by Justice Rehnquist. *Id.* at 368, 99 S. Ct. at 1159, 59 L. Ed. 2d at 385. Harkening back to the aberrant and overruled *Betts*, Justice Rehnquist stressed federalism concerns about extending the right to counsel further than the narrow holding of *Argersinger.* *Id.* at 372, 99 S. Ct. at 1161, 59 L. Ed. 2d at 388. He noted that because the Sixth Amendment was now incorporated against the states, "special difficulties" arose because "state and federal contexts are often different." *Id.* He further stated that the Supreme Court's cases had departed from the literal meaning of the Sixth Amendment, thereby implying that the "all criminal prosecutions" language of the Sixth Amendment did not pose an obstacle to limiting the right to counsel to cases involving actual imprisonment. *Id.* While finding that the intentions of the *Argersinger* Court were not entirely clear, the rule enunciated in that case had proved "reasonably workable" whereas an extension of the rule would impose unpredictable but necessarily substantial costs on the "quite diverse States." *Id.* at 373, 99 S. Ct. at 1162, 59 L. Ed. 2d at 389. Thus, in the name of federalism and practicality, the approach of *Powell*, *Zerbst*, *Gideon*, *Burgett*, *Tucker*, and *Argersinger* was not extended to misdemeanor cases in which imprisonment was authorized but not actually imposed in state court.

Justice Brennan, joined by Justices Marshall and Stevens, dissented. *Id.* at 375–89, 99 S. Ct. at 1163–70, 59 L. Ed. 2d at 390–99 (Brennan, J., dissenting). He emphasized the language of the Sixth Amendment, namely, that in "all criminal prosecutions," the accused shall enjoy the right to have the assistance of counsel. *Id.* at 375–76, 99 S. Ct. at 1163, 59 L. Ed. 2d at 390–91. While recognizing that

*Argersinger* took a "cautious" approach, he noted the question raised in *Scott* was expressly reserved in the case. *Id.* at 378–79, 99 S. Ct. at 1164–65, 59 L. Ed. 2d at 392–93. According to Justice Brennan, the Court's precedents showed the right to counsel is more fundamental to a fair trial than the right to a jury trial. *Id.* at 380, 99 S. Ct. at 1165, 59 L. Ed. 2d at 393. Justice Brennan emphasized that unlike many traffic or other regulatory offenses, the misdemeanor crime of theft carries with it a "moral stigma associated with common-law crimes traditionally recognized as indicative or moral depravity." *Id.* at 380, 99 S. Ct. at 1165–66, 59 L. Ed. 2d at 393–94.

According to Justice Brennan, the constitutionally required test for whether an accused should be afforded counsel was not an "actual imprisonment" test but instead an "authorized imprisonment" test. *Id.* at 382, 99 S. Ct. at 1166, 59 L. Ed. 2d at 394. Justice Brennan saw the "authorized imprisonment" test as more faithful to *Gideon*, presenting no practical problems, and consistent with legislative judgments of the seriousness of crime. *Id.* at 382–83, 99 S. Ct. at 1166–67, 59 L. Ed. 2d at 394–95. In short, Justice Brennan called out the majority for jumping the rails of the track plainly laid down by the Court's prior Sixth Amendment precedents.

The next turn of the caselaw occurred in *Baldasar v. Illinois*, 446 U.S. 222, 100 S. Ct. 1585, 64 L. Ed. 2d 169 (1980) (per curiam), *overruled by Nichols v. United States*, 511 U.S. 738, 748, 114 S. Ct. 1921, 1928, 128 L. Ed. 2d 745, 755 (1994). In *Baldasar*, the Supreme Court considered a slightly different but important question not decided in *Scott*, namely, whether an uncounseled conviction that did not result in actual imprisonment under *Scott* could be used as a predicate for enhancing a later offense that carried a prison term. *Id.* at 222, 100 S.

Ct. at 1585, 64 L. Ed. 2d at 171–72. A divided Illinois appellate court concluded such an uncounseled conviction could be used as a predicate to enhance the later crime. *Id.* at 223–24, 100 S. Ct. at 1586, 64 L. Ed. 2d at 172.

The judgment of the Court was announced in a per curiam opinion and was supported by three separate concurring opinions that garnered the support of five justices. *Id.* at 224–30, 100 S. Ct. at 1586–89, 64 L. Ed. 2d at 172–76. In an opinion for himself and joined by Justices Brennan and Stevens, Justice Stewart briefly wrote that under the specific facts presented, the conviction violated the principles outlined in *Scott. Id.* at 224, 100 S. Ct. at 1586, 64 L. Ed. 2d at 172–73 (Stewart, J., concurring). Justice Marshall, joined by Justices Brennan and Stevens, wrote more broadly. *Id.* at 224–29, 100 S. Ct. at 1586–88, 64 L. Ed. 2d at 173–76 (Marshall, J., concurring). He reinforced the proposition that the petitioner had been deprived of his liberty "as a result of [the first] criminal trial could not be clearer." *Id.* at 226, 100 S. Ct. at 1587, 64 L. Ed. 2d at 174 (internal quotation marks omitted). Justice Marshall emphasized a conviction that could not support a one day jail sentence could not support a subsequent conviction under a repeat offender statute imposing lengthy incarceration. *Id.* at 226–27, 100 S. Ct. at 1587, 64 L. Ed. 2d at 173–74. In a third brief opinion, Justice Blackmun concurred, noting Baldasar was entitled to counsel under his dissent in *Scott* because in the underlying proceeding he faced the possibility of incarceration for more than six months. *Id.* at 229–30, 100 S. Ct. at 1589, 64 L. Ed. 2d at 176 (Blackmun, J., concurring).

Justice Powell, joined by the Chief Justice, Justice White, and Justice Rehnquist dissented. *Id.* at 230–35, 100 S. Ct. at 1589–92, 64 L. Ed. 2d at 176–80 (Powell, J., dissenting). He argued the subsequent

enhanced conviction was valid under *Scott* because the defendant had the assistance of counsel during his prosecution for the enhanced offense. *Id.* at 231, 100 S. Ct. at 1589, 64 L. Ed. 2d at 177.

The multiple opinions in *Baldasar* caused confusion in the lower courts. The result of the case was clear, but which opinion was the narrowest opinion that, under the traditional approach to fractured opinions, formed the holding of the case was less so. The courts splintered. Many, but not all, saw the core holding of *Baldasar*, that an uncounseled conviction was invalid for the purpose of collaterally enhancing a sentence, as the precise result, relying upon Justice Marshall's opinion. *See, e.g.*, *United States v. Brady*, 928 F.2d 844, 854 (9th Cir. 1991), *abrogated by Nichols*, 511 U.S. at 748, 114 S. Ct. at 1928, 128 L. Ed. 2d at 755; *Lovell v. State*, 678 S.W.2d 318, 320 (Ark. 1984), *abrogated by Nichols*, 511 U.S. at 748, 114 S. Ct. at 1928, 128 L. Ed. 2d at 755; *State v. Laurick*, 575 A.2d 1340, 1347 (N.J. 1990), *abrogated by Nichols*, 511 U.S. at 748, 114 S. Ct. at 1928, 128 L. Ed. 2d at 755. Other courts relied primarily on the opinion of Justice Blackmun. *See, e.g.*, *Hlad v. State*, 565 So. 2d 762, 764–67 (Fla. Dist. Ct. App. 1990) (en banc); *State v. Orr*, 375 N.W.2d 171, 175–76 (N.D. 1985). Still others seem to have regarded the opinion as hopelessly splintered and without much precedential value. *See, e.g.*, *United States v. Eckford*, 910 F.2d 216, 220 (5th Cir. 1990); May, 18 Hamline L. Rev. at 253–55 (citing various theories employed by courts in interpreting *Baldasar*); Kirsten M. Nelson, Nichols v. United States *and the Collateral Use of Uncounseled Misdemeanors in Sentence Enhancement*, 37 B.C. L. Rev. 557, 570–72 (1996) (same).

The opaqueness of *Baldasar* was resolved for federal constitutional purposes in *Nichols*, 511 U.S. 738, 114 S. Ct. 1921, 128 L. Ed. 2d 745.

In *Nichols,* a federal criminal defendant received additional points under United States Sentencing Guidelines as the result of a state misdemeanor conviction for driving while under the influence for which he was fined but not incarcerated. *Id.* at 740, 114 S. Ct. at 1924, 128 L. Ed. 2d at 750. Because of the increase in points, the maximum sentence of imprisonment increased from 210 to 235 months. *Id.* The defendant claimed the increase in points was not allowed under *Baldasar. Id.* at 741, 114 S. Ct. at 1924, 128 L. Ed. 2d at 750. The district court disagreed and a divided panel of the Court of Appeals for the Sixth Circuit affirmed. *Id.* at 741–42, 114 S. Ct. at 1924–25, 128 L. Ed. 2d at 750–51.

A divided United States Supreme Court affirmed. *Id.* at 742, 114 S. Ct. at 1925, 128 L. Ed. 2d at 751. In a majority opinion by Chief Justice Rehnquist, the Court held that a sentencing court may consider a defendant's previous uncounseled misdemeanor conviction in sentencing a defendant for a subsequent offense so long as the uncounseled misdemeanor conviction did not result in a sentence of imprisonment. *Id.* at 748–49, 114 S. Ct. at 1928, 128 L. Ed. 2d at 755. Chief Justice Rehnquist emphasized that enhancement statutes do not change the penalty for the original uncounseled misdemeanor, but impose penalties only for the last offense committed by the defendant. *Id.* at 746–47, 114 S. Ct. at 1927, 128 L. Ed. 2d at 753–54.

Justice Blackmun, joined by Justices Stevens and Ginsburg, dissented. *Id.* at 754–65, 114 S. Ct. at 1931–37, 128 L. Ed. 2d at 758–65 (Blackmun, J., dissenting). Reminiscent of Justice Brennan's dissent in *Scott,* Justice Blackmun's opinion stressed the right to counsel applied to "all criminal prosecutions." *Id.* at 754–55, 114 S. Ct. at 1931, 128 L. Ed. 2d at 758–59. He argued the animating principle of the cases was "that

no indigent [should be] deprived of his liberty as a result of a proceeding in which he lacked the guiding hand of counsel." *Id.* at 757, 114 S. Ct. at 1932, 128 L. Ed. 2d at 760. Justice Blackmun wrote that while the subsequently enhanced conviction did not increase the penalties for the original offense for purposes of double jeopardy, it was still undeniable that Nichols's uncounseled conviction resulted in more than two years' imprisonment. *Id.* at 757, 114 S. Ct. at 1933, 128 L. Ed. 2d at 761. Justice Blackmun argued that a conviction that is invalid for purposes of the offense itself remains invalid for purposes of increasing the term of imprisonment imposed for a subsequent offense. *Id.* He further argued the majority opinion was inconsistent with *Burgett* and *Tucker*, decided only a few years earlier. *Id.* at 762–63, 114 S. Ct. at 1935, 128 L. Ed. 2d at 763–64.

Further, Justice Blackmun questioned the reliability of an uncounseled conviction. He emphasized that a rule that an uncounseled misdemeanor conviction can never form the basis for a term of imprisonment is faithful to *Gideon*'s admonition that " 'any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided.' " *Id.* at 762, 114 S. Ct. at 1935, 128 L. Ed. 2d at 764 (quoting *Gideon*, 372 U.S. at 344, 83 S. Ct. at 796, 9 L. Ed. 2d at 805). He noted a study, cited by Justice Douglas in *Argersinger*, showing misdemeanants represented by counsel were five times more likely to emerge from police court with all charges dismissed as those who have no representation. *Id.* at 763, 114 S. Ct. at 1936, 128 L. Ed. 2d at 764 (citing *Argersinger*, 407 U.S. at 36, 92 S. Ct. at 2012, 32 L. Ed. 2d at 538). According to Justice Blackmun:

> Given the utility of counsel [in misdemeanor cases], the inherent risk of unreliability in the absence of counsel, and

the severe sanction of incarceration that can result directly or indirectly from an uncounseled misdemeanor, there is no reason in law or policy to construe the Sixth Amendment to exclude the guarantee of counsel where the conviction subsequently results in an increased term of incarceration.

*Id.* In any event, both *Scott* and *Nichols* departed from the traditional Sixth Amendment reliability rationale driven by federalism and practicality concerns.

Most recently, the Supreme Court decided *Alabama v. Shelton*, 535 U.S. 654, 122 S. Ct. 1764, 152 L. Ed. 2d 888 (2002). In *Shelton*, the Supreme Court considered whether a misdemeanor assault conviction in which a sentence of thirty-days' imprisonment was suspended with probation imposed was the kind of criminal proceeding entitling the accused to a lawyer. *Id.* at 657–58, 122 S. Ct. at 1767, 152 L. Ed. 2d at 895. In *Shelton*, the Alabama Supreme Court concluded that a suspended sentence constitutes "a term of imprisonment" under *Argersinger* and *Scott* even though incarceration was not immediate or inevitable. *Id.* at 659, 122 S. Ct. at 1768, 152 L. Ed. 2d at 896. The Supreme Court affirmed. *Id.* at 674, 122 S. Ct. at 1776, 152 L. Ed. 2d at 905–06. In an opinion by Justice Ginsburg, the majority first recognized the "actual imprisonment" test of *Argersinger* and *Scott*. *Id.* at 662, 122 S. Ct. at 1769–70, 152 L. Ed. 2d at 898. Applying an "actual imprisonment" test, the Court concluded "[a] suspended sentence is a prison term imposed for the offense of conviction." *Id.* at 662, 122 S. Ct. at 1770, 152 L. Ed. 2d at 898. The majority rejected the view that counsel could be appointed when probation revocation was contemplated, noting that under applicable state law, the issue at that point was narrow and did not provide for the relitigation of the underlying offense. *Id.* at 667, 122 S. Ct. at 1772, 152 L. Ed. 2d at 901. Addressing the argument that requiring counsel in such cases would be

unduly burdensome, the majority noted "most jurisdictions already provide a state-law right to appointed counsel more generous than that afforded by the Federal Constitution." *Id.* at 668, 122 S. Ct. at 1773, 152 L. Ed. 2d at 902 (citing *Nichols*, 511 U.S. at 748 n.12, 114 S. Ct. 1928 n.12, 128 L. Ed. 2d at 755 n.12).

Four members of the Supreme Court dissented in *Shelton*. *Id.* at 674–81, 122 S. Ct. at 1776–80, 152 L. Ed. 2d at 906–10 (Scalia, J., dissenting). Writing for the dissenters, Justice Scalia emphasized that actual imprisonment was the touchstone triggering the right to counsel under the Sixth Amendment. *Id.* at 675, 122 S. Ct. at 1776, 152 L. Ed. 2d at 906. The dissenters emphasized that actual imprisonment in *Shelton* was only a contingency and would occur only if a future probation violation occurred and if the state court remedy for the probation violation was actual imprisonment. *Id.* at 675–76, 122 S. Ct. at 1777, 152 L. Ed. 2d at 906–07. In other words, imposition of a suspended sentence did not result in actual imprisonment triggering the right to counsel under the Sixth Amendment. *See id.*

Finally, there is one additional case which, though not dealing with the right of a poor person to appointed counsel in misdemeanor prosecutions, has some bearing on the analysis. In *Padilla v. Kentucky*, 559 U.S. 356, 359–60, 130 S. Ct. 1473, 1478, 176 L. Ed. 2d 284, 289–90 (2010), the United States Supreme Court held that a lawyer who does not advise a client of the immigration consequences of a criminal conviction may provide ineffective assistance of counsel. The immigration consequences of a criminal conviction have, of course, been considered "collateral consequences" and ordinarily counsel have not been held to have an obligation to explain them to a client. *See id.* at 375–76, 130 S. Ct. at 1487–88, 176 L. Ed. 2d at 300 (Alito, J., concurring). However, in

*Padilla,* the Supreme Court recognized that the collateral consequences—namely deportation—may be more significant than the sanctions available in the underlying proceeding. *Id.* at 368, 130 S. Ct. at 1483, 176 L. Ed. 2d 284, 295 (majority opinion). *Padilla*'s recognition that the collateral consequence of deportation may be more powerful than criminal sanctions including "actual imprisonment" tends to undermine the categorical rule of *Scott* that "actual imprisonment" is a special sanction and is meaningfully more severe than the other consequences of criminal convictions. If Justice Scalia is right, who wrote in dissent that the principle in *Padilla* could not be contained but would expand to other collateral consequences, then the theoretical underpinning of *Scott* may be unraveling. *See id.* at 388–92, 130 S. Ct. at 1494–97, 176 L. Ed. 2d 284, 307–10 (Scalia, J., dissenting).

In summary, the extent to which poor people are entitled to the assistance of counsel in misdemeanor cases has been hotly contested in the United States Supreme Court. While the animating rationale of *Powell, Zerbst, Gideon, Burgett, Tucker,* and *Argersinger* stressed the role of counsel in producing fair results, the majority in *Scott* and *Nichols* dramatically changed the emphasis to practicality considerations and notions of federalism.

But even the "actual imprisonment" test of *Scott* and *Nichols* has not proved satisfactory to the majority of the Court, and in *Shelton,* the right to counsel was triggered by a sentence that could eventually lead to actual incarceration. In addition, it is at least arguable that *Padilla* suggests the bright-line distinction between "actual imprisonment" and other consequences of criminal conviction may no longer be valid. *Padilla* may indicate a renewed receptivity to Justice Powell's concurring opinion in *Argersinger,* which asserted that important collateral impacts

such as loss of employment or loss of a driver's license might be far more important to a poor person than a short stint in jail. *See Argersinger*, 407 U.S. at 48, 92 S. Ct. at 2018, 32 L. Ed. 2d at 544–45 (Powell, J., concurring in the result).

Until modified by the United States Supreme Court, however, *Scott* stands for the proposition that under the Sixth Amendment to the United States Constitution, a poor misdemeanant defendant does not have a right to counsel unless "actual imprisonment" actually occurs regardless of the collateral consequences or the fairness of the underlying proceeding. 440 U.S. at 369, 99 S. Ct. at 1160, 59 L. Ed. 2d at 386. *Nichols* stands for the proposition that a valid misdemeanor conviction, which includes an uncounseled misdemeanor conviction when no imprisonment was imposed, may be used in a sentence enhancement scheme without running afoul of the Sixth Amendment. 511 U.S. at 748–49, 114 S. Ct. at 1928, 128 L. Ed. 2d at 755. The question is: do we reach the same results under the Iowa Constitution?

5. *State law regarding the right to counsel for misdemeanants.* In order to determine whether we should follow the reasoning of United States Supreme Court precedent in interpreting our state constitution, the precedents of other states can be instructive. *See Baldon*, 829 N.W.2d at 818 (Appel, J., specially concurring) (noting other states' constitutional analysis "can serve as a springboard for [our own] analysis").

As pointed out in *Nichols* and *Shelton*, state law generally provides counsel for poor people more generously than the caselaw of the United States Supreme Court under the Sixth Amendment. *See Shelton*, 535 U.S. at 668, 122 S. Ct. at 1773, 152 L. Ed. 2d at 902; *Nichols*, 511 U.S. at 748 n.12, 114 S. Ct. at 1928 n.12, 128 L. Ed. 2d at 755 n.12. These

more generous provisions are often based in statute, rule, or the exercise of supervisory powers by the judiciary. According to a 2009 survey, nine states by statute provided counsel in all, or virtually all criminal proceedings; fifteen states provided counsel for any offenses punishable by imprisonment; eight states provided counsel for offenses punishable by incarceration or a fine of more than a specified amount, or for any offense with a minimal incarceration period or fine; fourteen states provided counsel for any criminal offense except when imprisonment is not authorized; and five states required a sentence of actual imprisonment for a defendant to be entitled to court-appointed counsel. *See* Marcus, 21 St. Thomas L. Rev. at 164–65 & nn. 141–46 (citing state statutes).

We begin our substantive discussion of state constitutional law by noting that prior to *Scott*, a number of state supreme courts held that the "all criminal prosecutions" type language in their state constitutions was broad enough to cover misdemeanors. *See, e.g.*, *In re Johnson*, 398 P.2d 420, 422 (Cal. 1965) (noting California Constitution provides right to counsel "in criminal prosecutions, in any court whatever," which includes misdemeanors); *Bolkovac v. State*, 98 N.E.2d 250, 252–53 (Ind. 1951) (observing Indiana Constitution provides for the right to counsel in "all criminal prosecutions" and makes no distinction between felonies and misdemeanors); *Decker v. State*, 150 N.E. 74, 76 (Ohio 1925) (noting Ohio Constitution providing for counsel to appear "in any trial, in any court" includes misdemeanor prosecutions); *Hunter v. State*, 288 P.2d 425, 428 (Okla. Crim. App. 1955) (noting the "all criminal prosecutions" language under the Oklahoma Constitution and finding that "[n]o distinction is drawn between a felony or misdemeanor"); *Brown v. Dist. Ct.*, 570 P.2d 52, 55 (Or. 1977) (en banc) (observing that "all criminal

prosecutions" in Oregon Constitution includes all conduct that the legislature has defined as a criminal offense). These cases often involved the right to retained counsel rather than appointed counsel, but if the right to have the assistance of retained counsel in one's defense is fundamental to the fairness of the proceeding, how can a proceeding be fair if a poor person is required to proceed without counsel?

With respect to the *Nichols* question of whether a valid but uncounseled misdemeanor conviction can be used to enhance incarceration in a subsequent offense, a number of state courts after *Baldasar* held under their state constitutions that a poor person's uncounseled misdemeanor conviction could not be used to enhance a subsequent criminal offense. *See, e.g., State v. Dowd*, 478 A.2d 671, 678 (Me. 1984), *overruled by State v. Cook*, 706 A.2d 603, 605 (Me. 1998).

After *Nichols*, however, a number of states changed course and followed the new United States Supreme Court precedent. For example, the Maine Supreme Court overruled its prior precedent under its state constitution to conform with the new federal precedent. *Cook*, 706 A.2d at 605. The West Virginia Supreme Court overruled its cases to follow the new federal precedent. *See State ex rel. Webb v. McCarty*, 542 S.E.2d 63, 66–67 (W. Va. 2000) (citing *State v. Hopkins*, 453 S.E.2d 317, 324 (W. Va. 1994)). At the time of their decisions, these state supreme courts generally followed a highly deferential approach to federal precedents and, as such, their opinions are conclusory in nature. *See State v. Weeks*, 681 A.2d 86, 88 (N.H. 1996); *State v. Porter*, 671 A.2d 1280, 1282–84 (Vt. 1996).

Several states have pursued their own path under their state constitutions or statutes. For example, in *Brisson v. State*, 955 P.2d 888, 891 (Wyo. 1998), the Wyoming Supreme Court held the requirement

under a Wyoming statute that counsel "shall be appointed" for "serious crimes" included cases in which incarceration was a practical possibility. *Brisson* noted the clear invitation in *Nichols* that states were free to implement stricter standards. *Id.* (citing *Nichols*, 511 U.S. at 748 n.12, 114 S. Ct at 1129 n.12, 128 L. Ed. 2d at 755 n.12). Although the case involved statutory grounds, the Wyoming Supreme Court also announced that it would "decline to follow the United States Supreme Court's actual incarceration approach" and cited *State v. Sinagoga*, 918 P.2d 228, 241 (Haw. Ct. App. 1996), *overruled in part on other grounds by State v. Veikoso*, 74 P.3d 575, 583 n.8 (Haw. 2003), a case under the Hawaii Constitution. *Brisson*, 955 P.2d at 891. The *Brisson* court further emphasized that its concern arose from "the reliability of uncounseled convictions." *Id.* ("In order to allow a sentencing court to consider previous convictions, we must be convinced that such convictions are reliable.").

Similarly, in *Sinagoga*, the Hawaii appellate court adopted reasoning independent from *Nichols* under the Hawaii Constitution. 918 P.2d at 242 (choosing "not to follow the rationale in *Nichols*" in the context of consecutive term sentencing). The *Sinagoga* court relied heavily on the language of *Burgett* and *Tucker*, reasoning that the reliability of the underlying prior convictions is the "linchpin" for due process consideration. *Id.* at 238, 241. Although the Hawaii right-to-counsel provision has distinctive language, the *Sinagoga* court utilized a functional rather than textual analysis. *See* Haw. Const. art. I, § 14; *Sinagoga*, 918 P.2d at 240 n.12, 241.

In *State v. Henes*, the North Dakota Supreme Court, citing state caselaw precedent from 1985, noted that " 'absent a valid waiver of the right to counsel the resulting [uncounseled misdemeanor] conviction

cannot, under art. I, § 12, [of the North Dakota Constitution] be used to enhance a term of imprisonment for a subsequent offense.'" 763 N.W.2d 502, 505 (N.D. 2009) (quoting *Orr*, 375 N.W.2d at 178–79 (recognizing "the right to counsel under [the North Dakota] Constitution is fundamental because it enables an accused to procure a fair trial")); *see also City of Grand Forks v. Mata*, 517 N.W.2d 626, 630 (N.D. 1994) ("*Orr*'s practical consequence is that, regardless of the penalty to be imposed, a court must afford a nonindigent defendant the opportunity to retain counsel, appoint counsel for an indigent defendant, or obtain a valid waiver of counsel on the record if that conviction is to be used as a basis for enhancing the penalty for a subsequent conviction.").

In short, the North Dakota Supreme Court has followed the fundamental fairness rationale of *Powell*, *Zerbst*, *Gideon*, *Burgett*, *Tucker*, and *Argersinger*, and not the federalism and practicality rationales of *Scott* and *Nichols*.

The Florida Supreme Court also recently refused to follow federal precedent. The Florida Supreme Court has employed similar analysis under article I, section 16 of the Florida Constitution, which declares that in "all criminal prosecutions," the accused has "the right . . . to be heard in person, by counsel or both." Fla. Const. art. I, § 16(a). The Florida trail begins with *Hlad*, 585 So. 2d at 930 and *State v. Beach*, 592 So. 2d 237, 238 (Fla. 1992). After the Supreme Court decided *Nichols*, in *State v. Kelly*, 999 So. 2d 1029, 1032–33 (Fla. 2008), the State of Florida urged the Florida Supreme Court to abandon *Hlad* and *Beach* and adopt the *Nichols* approach. The Florida Supreme Court declined to do so. *Id.* at 1039. The court, like many of the other state supreme courts rejecting the *Nichols* approach, focused on the reliability of the uncounseled convictions. *Id.* at 1048–49. The *Kelly* court noted that the unreliability

of prior uncounseled misdemeanor convictions "does not turn on the length of the prospective term of imprisonment," but rather "on the fact that even an uncounseled innocent gains little by contesting a 'petty' misdemeanor where the prosecuting attorney is offering a low fine and community service in exchange for a guilty or no-contest plea." *Id.* at 1051.

In summary, state courts too have wrestled with the questions inherent in *Scott* and *Nichols,* with varying results. Some, but not all, rely on state constitutional language different from the Sixth Amendment in departing from federal precedent. Aside from linguistic differences, those courts that emphasize the fundamental fairness principle as the bedrock principle, rather than the federalism and practicality concerns of *Scott* and *Nichols,* tend to follow *Powell* and its progeny. Jurisdictions that are inclined to follow the federal model through a lockstep approach even if it requires overturning recent state constitutional precedent have tended to follow the Supreme Court's lead.

6. *Post-*Gideon *legislation, rulemaking, and caselaw developments regarding the right to counsel in Iowa.* We begin our discussion with legislative and rulemaking developments. As early as 1860, the Iowa Code provided that if a defendant "appear[s] for arraignment without counsel, he must be informed by the court, that it is his right to have counsel . . . and [if he] is unable to employ any, [the court must] assign him counsel." *See* Iowa Code § 4685 (1860). This right to counsel extended not only to felons, but also to misdemeanants when the penalty might exceed a fine of $100 or imprisonment for more than thirty days, i.e. in the case of indictable misdemeanors (which today include serious and aggravated misdemeanors). *Id.* § 4499(3); *see Wright v. Denato*, 178 N.W.2d 339, 342 (Iowa 1970) (holding "an indigent defendant charged

with an indictable misdemeanor is entitled to appointment of counsel upon request"); Op. Iowa Att'y Gen. 160–62 (1964) ("[C]ounsel must be appointed for indigent defendants accused of felonies and indictable misdemeanors at the preliminary hearing."); *see also* Op. Iowa Att'y Gen. 179–82 (1966) (same). Thus, long before *Gideon*, the statutory policy in Iowa provided counsel for most misdemeanants.

In 1976, the Iowa legislature enacted statutory provisions completely revising criminal procedure laws. *See* 1976 Iowa Acts ch. 1245, ch. 2, div. XIII (effective beginning Jan. 1, 1978) (currently found at Iowa R. Crim. P. 2.1–.76). At that time, the legislature passed a vague provision in a new section relating to the trial of simple misdemeanors which stated that "[i]n appropriate cases" Iowa courts shall appoint counsel to assist in the defense of indigent defendants. *Id.* § 1302, r. 42. The following year, in 1977, the legislature changed the language to require the appointment of counsel for indigents when the defendant faced the "possibility of imprisonment." 1977 Iowa Acts ch. 153, § 85. This statutory provision was in place at the time *Scott* was decided. We subsequently incorporated the "possibility of imprisonment" language into what is now Iowa Rule of Criminal Procedure 2.61(2).

Thus, under Iowa legislative enactment and court rule, the right to counsel in Iowa has been extended to all criminal proceedings in which there is "a possibility of imprisonment" since before *Scott* was decided. Although the Supreme Court in *Scott* later adopted a more restrictive approach, the Iowa statute, replaced by the subsequent verbatim court rule, was not altered and remains on the books today. *See* Iowa R. Crim. P. 2.61(2).

We now turn to Iowa caselaw developments related to the right to counsel. Our early cases deal with the entitlement of counsel to payment

pursuant to statutory provisions providing for the appointment of counsel. *See, e.g., Ferguson v. Pottawattamie County*, 224 Iowa 516, 518, 278 N.W. 223, 224 (1938); *Hall*, 2 Greene at 476. Although these cases evince some solicitude to the role of counsel, they have no particular relevance to the constitutional question presented in this case.

We have considered numerous right-to-counsel cases in which the defendant only invoked the Sixth Amendment. *See, e.g., State v. Wilkins*, 687 N.W.2d 263, 264–65 (Iowa 2004) (per curiam); *State v. Cooper*, 343 N.W.2d 485, 486 (Iowa 1984), *overruled by Wilkens*, 687 N.W.2d at 265; *Osmundson*, 315 N.W.2d at 10. Particularly instructive is *Osmundson*. In *Osmundson*, an indigent was facing a jail sentence for contempt of court. 315 N.W.2d at 10. The indigent claimed he was entitled to appointment of counsel at public expense. *Id.* at 11. We agreed. *Id.* at 14. In coming to our conclusion, we noted that "we . . . make no attempt to arrive at our own independent interpretation of the United States Constitution, but follow the federal decisions as we understand them." *Id.* at 13. Citing the "unique language" of article I, section 10 of the Iowa Constitution ("In all criminal prosecutions, and in cases involving the . . . liberty of an individual the accused shall have a right . . . to have the assistance of counsel."), we observed the petition did not raise the question of whether a poor person could claim entitlement to counsel in a contempt proceeding under it. *Id.* Nor were we required to examine the Iowa rules of criminal procedure because the case was not a criminal prosecution. *Id.* at 13–14.

We considered two cases after *Gideon* that dealt with the federal right to counsel in misdemeanor cases. In *Cooper*, 343 N.W.2d at 486, we considered whether two prior uncounseled misdemeanor convictions could be used to enhance a theft conviction to theft in the third degree,

the very issue posed in this case. We concluded that they could not. *Id.* In support of our holding, we cited "the reasoning in *Baldasar*," "our own view of the importance of counsel," and "[t]he lack of reliability [of] an uncounseled conviction." *Id.* We noted the collateral consequences of conviction on the enhanced charge could include fines, social stigma, loss of a job, and decreased employment prospects. *Id.* While we cited Sixth Amendment caselaw, we also cited two state law cases, *State v. Nordstrom*, 331 N.W.2d 901, 903–05 (Minn. 1983), and *State v. Grenvik*, 628 P.2d 1195, 1196–97 (Or. 1981) (en banc), *abrogated by State v. Probst*, 124 P.3d 1237, 1245 (Or. 2005), which precluded use of uncounseled misdemeanors to enhance a subsequent crime under state law. *Cooper*, 343 N.W.2d at 486. Among the various interpretations swirling around the courts after *Baldasar*, our decision in *Cooper* is most consistent with Justice Marshall's opinion. *Cf. Baldasar*, 446 U.S. at 224–29, 100 S. Ct. at 1186–88, 64 L. Ed. 2d at 173–75 (Marshall, J., concurring).

After the Supreme Court decided *Nichols*, we backtracked from *Cooper* and sought to follow the new federal precedent in a per curiam opinion in *Wilkins*, 687 N.W.2d at 265. In *Wilkins*, the sole claim was whether the use of uncounseled convictions to enhance a later crime violated the Sixth Amendment. *Id.* at 264–65. No issues were raised in *Wilkins* under the Iowa Constitution. *See id.* We stated that once the Supreme Court ruled in *Nichols*, "our own view of the importance of counsel," *id.* (internal quotation marks omitted), and our concerns about the reliability of prior convictions were now irrelevant on the federal constitutional issue subsequently teed up and squarely decided in *Nichols*. *Id.* (citing *Cooper*, 343 N.W.2d at 486). There was no recognition of the nuance in Justice Souter's *Nichols* opinion, which

stressed that the misdemeanor convictions were used as part of a sentencing structure that preserved at least some discretion for the trial court. *Compare id., with Nichols*, 511 U.S. at 749–54, 114 S. Ct. at 1929–31, 128 L. Ed. 2d at 755–58 (Souter, J., concurring in the judgment). In *Wilkins*, there was no follow-up on the tantalizing suggestion in *Osmundson* regarding the "unique language" of article I, section 10 of the Iowa Constitution or of the Iowa Rules of Criminal Procedure. *Compare Osmundson*, 315 N.W.2d at 13, *with Wilkens*, 687 N.W.2d at 265.

Finally, in *Allen*, 690 N.W.2d at 686, an indigent defendant claimed that under the Iowa Constitution, prior uncounseled misdemeanor convictions could not be used to enhance a subsequent crime even when actual incarceration did not occur as required in *Scott* and *Nichols*. The defendant did not cite a specific provision of the Iowa Constitution, but did cite *Cooper*, 243 N.W.2d at 485, and generally argued the unreliability of uncounseled convictions precluded their use in the enhancement of the subsequent charge. *Allen*, 690 N.W.2d at 686–87.

In *Allen*, we briefly recognized the "ebb and flow" of United States Supreme Court decisions beginning with *Argersinger* and ending in *Nichols*. *Id.* at 687–89. We then proceeded to consider the Iowa constitutional claims. *Id.* at 689–92. Remarkably, we did not cite the "unique language" of article I, section 10 as in *Osmundson*, but instead inaccurately declared that the language was "textually similar" to the federal counterpart. *Id.* at 690. Although *Allen* states that other state courts who declined to follow *Nichols* did so with distinctive language in their state constitutions "authoriz[ing] the possibility of incarceration," *id.* at 690–91 (emphasis omitted), the Iowa language stating that the

right to counsel exists in "cases involving liberty" seems to do just that, Iowa Const. art. I, § 10.

We declared in *Allen* that there must be some principled basis for distinguishing *Nichols*. *Allen,* 690 N.W.2d at 690. But, as is apparent, particularly in our recent cases, there is no presumption of the correctness of federal law. *See Short,* 851 N.W.2d at 486–87 (noting there is no presumption that federal construction of similar language is correct); *Baldon,* 829 N.W.2d at 821 (Appel, J., specially concurring) ("[T]here is no presumption that . . . federal law is the correct approach."); *State v. Ochoa,* 792 N.W.2d 260, 267 (Iowa 2010) (same). Instead, federal precedent has a bearing on our interpretation of state law only to the extent its reasoning persuades us. *See Ochoa,* 792 N.W.2d at 267.

There are substantial reasons to question the reasoning of *Nichols*. The *Allen* court failed to recognize that *Scott,* upon which *Nichols* critically relied, was based upon federalism and pragmatic concerns that had no application in Iowa. The strong emphasis in *Scott* on its federalism concern about a one-size-fits-all rule for the diverse states has no bearing on determining questions of state constitutional law that impact only one state. In addition, although the *Allen* court mimicked the speculative fiscal concerns in *Scott* by stating that a decision to require counsel for poor misdemeanor defendants would impose "significant additional burdens on the criminal justice system," 690 N.W.2d at 692, the *Allen* court was apparently not familiar with Iowa's long standing legislative policy, now embraced in Iowa Rule of Criminal Procedure 2.61(2), that poor persons are entitled to appointment of counsel in misdemeanor cases when there is a "possibility of imprisonment," a standard consistent with Justice Brennan's dissent in

*Scott.* *See Scott*, 440 U.S. at 375–89, 99 S. Ct. at 1163–70, 59 L. Ed. 2d at 390–99 (Brennan, J., dissenting).

The *Allen* court also failed to recognize that in *Cooper*, we emphasized our "own view of the importance of counsel," the "lack of reliability of uncounseled convictions," and cited cases relying on state law to prohibit sentencing enhancements arising from uncounseled misdemeanor convictions. *Cooper*, 343 N.W.2d at 486. The powerful language in *Powell, Zerbst, Gideon, Burgett, Tucker*, and *Argersinger* regarding the role of counsel in promoting the reliability of the fact-finding process in criminal proceedings regardless of the severity of punishment is entirely ignored. The *Allen* opinion contains no discussion at all about the realities of the management of the misdemeanor docket or the *Argersinger* concern about "assembly-line justice." *Argersinger*, 407 U.S. at 36, 92 S. Ct. at 2012, 32 L. Ed. 2d at 538 (internal quotation marks omitted). And, the *Allen* court did not evince awareness of the dramatic increase and rapid expansion of collateral consequences for even minor offenses such as shoplifting, theft, or vagrancy.

Finally, and understandably, the *Allen* court was not in a position to consider developments that occurred after the case was decided. Although the *Allen* court declared it did not "detect a trend in our sister state courts to abandon the federal analysis," 690 N.W.2d at 690, the *Allen* court did not have the benefit of the Florida case declining to follow *Nichols, see Kelly*, 999 So. 2d at 1039. It also was not aware of *Padilla* and its potential undermining of the *Nichols* rationale. *See Padilla*, 559 U.S. at 368, 130 S. Ct. at 1483, 176 L. Ed. 2d at 294.

For the above reasons, we conclude *Allen* is fundamentally flawed and the issue presented, namely, whether the uncounseled misdemeanor

conviction of a poor person facing the possibility of incarceration may be used to enhance a subsequent crime, should be considered anew.

**F. Analysis of Scope of Article I, Section 10 for Misdemeanor Cases.**

1. *Textual analysis.*  We begin our discussion by noting the force of the plain language of the Iowa Constitution, article I, section 10.  The language provides that the right to counsel applies "in all criminal prosecutions."  Iowa Const. art. I, § 10.  It does not say *some* criminal prosecutions.  It does not say *felonies* only.  And, of course, the text says nothing at all about "actual incarceration."

A plain reading of the constitutional text causes us to question the reasoning of *Scott* and *Nichols.*  We are not dealing with an open-textured phrase such as "privileges and immunities" or "due process of law*"* which are inherently, if not deliberately, ambiguous and require a process of constant reinterpretation and reappraisal.  We do not deny there can be important line-interpretive questions regarding the meaning of the phrase.  There is, for instance, a substantial question as to when a criminal prosecution begins.  But the language of the "all criminal prosecutions" provision of article I, section 10 is directed toward providing counsel in order to avoid the risk of *conviction,* not the risk of *incarceration.*  And if this choice of language means anything, it is difficult to avoid the conclusion that the phrase "all criminal prosecutions" was expressly designed to avoid judicially imposed slicing and dicing of criminal prosecutions into two or more categories.  *See, e.g., In re Johnson*, 398 P.2d at 422; *Bolkovac*, 98 N.E.2d at 255; *Decker*, 150 N.E. at 76; *Hunter*, 288 P.2d at 428; *Brown*, 570 P.2d at 55.  The bill of rights of the Iowa Constitution embraces the notion of "inalienable

rights," not rights that shrink and disappear based upon currently fashionable transient pragmatic assessments. *See* Iowa Const. art. I, § 1.

Our linguistic concerns are exacerbated by the double-breasted nature of the Iowa Constitution's right-to-counsel provision. Not only does the Iowa Constitution expressly apply in "all criminal prosecutions," it also applies in "cases involving the life, or liberty of an individual." *Id.* art. I, § 10. Unlike the "all criminal prosecutions" language, the liberty language of the "cases" clause is directed toward a limited category of cases involving a person's interest in physical liberty. *See id.*

We believe that liberty is "involved" in a misdemeanor prosecution when an accused is charged under a statute that authorizes incarceration. The founders of the Iowa Constitution intended a bill of rights in which article I, section 10 is a part to be read in a generous fashion, not in a cramped, stingy, or fearful fashion. According to George Ells, Chairman of the Committee on the Preamble and Bill of Rights, the committee wanted provisions in the Iowa Bill of Rights that " 'would enlarge, and not curtail the rights of the people' " and would " 'put upon record every guarantee that could be legitimately placed there in order that Iowa . . . might . . . have the best and most clearly defined Bill of Rights.' " *Baldon*, 829 N.W.2d at 810 (Appel, J., specially concurring) (quoting 1 *The Debates of the Constitutional Convention of the State of Iowa* 100 (W. Blair Lord rep., 1857) [hereinafter *The Debates*], *available at* www.statelibraryofiowa.org/services/collections/law-library/iaconst.).

As a matter of constitutional history, it is clear the "cases" language in the Iowa Constitution arose, at least in part, in order to provide protections to persons subject to return to slavery under the Federal Fugitive Slave Act. *See* 2 *The Debates* at 736–41. The inclusion of the "cases" language was hotly debated by the drafters, as apparent

from spirited exchanges namely between Mr. Clark and Mr. Harris. *Id.* Mr. Harris had recommended an amendment to strike such language from section 10, which was rejected. *Id.* at 741. Mr. Clark contended that

> unless we have the right to make a constitution which will secure to me the right of jury trial, if I am claimed as a fugitive slave, without that right we are not a sovereign people. Without that right we cannot protect every individual member of society.

*Id.* at 737. What is apparent, therefore, is that one of the purposes of the "cases" language was to guarantee the protections of article I, section 10 to those whom no formal criminal prosecution was or could be instituted, thereby providing broader protections than the United States Constitution. *See id.* at 736–41.

In this respect, the Iowa judiciary, the writers of the Iowa Constitution of 1857, and the contemporary political branches of government embraced a view of law that was not only independent from, but fundamentally at odds with, federal law on the slavery issue. *See Short*, 851 N.W.2d at 483; 2 *The Debates* at 738–39 ("I believe [the fugitive slave law] to be unconstitutional.") (remarks by Mr. Wilson).

But the "cases" language of article I, section 10 has broader application than the immediate problem it was designed to ameliorate. While it may be that the "cases" language amounts to constitutional support for a right to counsel in qualifying civil contexts, it also strongly suggests that if a right to counsel exists in civil cases in which "liberty" is involved, it also must exist in criminal prosecutions in which "liberty" is also at stake.

2. *Functional or structural analysis.* Aside from textual analysis, we also find a functional analysis supports the view that a right to

counsel exists under the Iowa Constitution *at least* when imprisonment is authorized. We note the observations of Justice Powell in his concurring opinion in *Argersinger*. *See* 407 U.S. at 44–66, 92 S. Ct. at 2016–27, 32 L. Ed. 2d at 542–55 (Powell, J., concurring in result). While some statutory offenses that merely impose fines may be considered regulatory in nature and have little if any consequence, statutes that authorize the imposition of imprisonment invariably contain a reputational sting far beyond mere law violation. A person convicted of a misdemeanor arising from shoplifting may have difficulty holding or obtaining a job, particularly in the era of electronic access to information. A driver's license or professional license may be adversely affected. A simple misdemeanor conviction may have other collateral impacts, such as impairing the ability of persons to obtain educational, housing, or other important benefits. A simple misdemeanor conviction involving drugs could adversely impact immigration status. *See generally* Gabriel J. Chin & Richard W. Holmes, *Effective Assistance of Counsel and the Consequences of Guilty Pleas*, 87 Cornell L. Rev. 697, 699–700 (2002) (observing the "imposition of collateral consequences has become an increasingly central purpose of the modern criminal process"); Gross, 22 Wm & Mary Bill Rts. J. at 80–87 (describing the rise of collateral consequences over the last several decades); Jenny Roberts, *Why Misdemeanors Matter: Defining Effective Advocacy in the Lower Criminal Courts*, 45 U.C. Davis L. Rev. 277, 297–303 (2011) (noting the "most pervasive collateral effect of a misdemeanor conviction is the ability to find and keep work"). While the prospect of these impacts were recognized by Justice Powell in his *Argersinger* concurrence, they are even greater today. *See* 407 at 44–66, 92 S. Ct. at 2016–27, 92 L. Ed. 2d at 542–55. These adverse effects must be evaluated not from the

perspective of comfortable middle-class judges, but from the viewpoint of the poor with their attendant life challenges.

We also do not believe a lawyer's help is irrelevant in misdemeanor convictions when imprisonment is authorized. The breathtaking and inspiring language of Justice Sutherland in *Powell* emphasized that "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." 287 U.S. at 68–69, 53 S. Ct. at 64, 77 L. Ed. at 170. Simply put, a person does not get his "day in court" without a lawyer. Although the narrow issue in *Gideon* was whether the right to counsel extended to noncapital felony cases, Justice Clark's reasoning emphasized "there cannot constitutionally be a difference in the quality of process based merely upon a supposed difference in the sanction involved." 372 U.S. at 349, 83 S. Ct. at 799, 9 L. Ed. 2d at 808 (Clark, J., concurring in the result). Similarly, much of the rationale in *Argersinge*r was based not on the offense charged, but instead on the undeniable fact that in *any* criminal prosecution, whether a capital offense, a felony, or a misdemeanor, complicated legal problems may arise that the average person cannot satisfactorily navigate without the assistance of counsel. Indeed, as pointed out by Justice Douglas in *Argersinger*, the history of our jurisprudence is rife with very complicated and important legal questions arising in the context of misdemeanor prosecutions. *See* 407 U.S. at 32–34, 92 S. Ct. at 2010–11, 32 L. Ed. 2d at 535–36 (majority opinion); *see also Lawrence v. Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 2484, 156 L. Ed. 2d 508, 525–26 (2003) (nolo contendere plea to misdemeanor raises fundamental issues regarding sodomy statutes); *Atwater v. City of Lago Vista*, 532 U.S. 318, 323, 121 S. Ct. 1536, 1541, 149 L. Ed. 2d 549, 558 (2001) (case involving seat-belt violation raises important search and seizure issues).

*Scott* and *Nichols* are inconsistent with the traditionally close relationship between the due process right to a fair trial and the right to counsel. The heart of *Gideon* is concern over the fairness and reliability of the criminal justice process. As noted in Justice Blackmun's dissent in *Nichols,* it is difficult to understand why an uncounseled misdemeanor conviction that could not be used to support one day of incarceration can later be used in an enhancement statute to significantly lengthen the period of incarceration for the later crime. 511 U.S. at 757, 114 S. Ct. at 1933, 128 L. Ed. 2d at 761 (Blackmun, J., dissenting). If ensuring fairness and reliability of criminal justice outcomes are the constitutional forces underlying the right to counsel, an uncounseled misdemeanor conviction cannot support incarceration directly or in subsequent cases. *See Cooper*, 343 N.W.2d at 486 (citing "our own view of the importance of counsel" and declaring "[t]he lack of reliability in an uncounseled conviction that prevents the imposition of incarceration also prevents enhancement of the charge"). We conclude the reasoning of *Cooper* and the state court cases declining to follow *Nichols* is more persuasive. *See id.*; *Kelly,* 999 So. 2d at 1048–49; *Brisson,* 955 P.2d at 891.

3. *Iowa tradition regarding the right to counsel.* Finally, we note that statutory enactments and court rules are consistent with an interpretation that the right to counsel extends to cases in which imprisonment is authorized. The right to counsel established by the Iowa legislature going back almost forty years provided for counsel when there is a "possibility of imprisonment." *See* 1977 Iowa Acts ch. 153, § 85. We subsequently adopted this legislative formulation as part of our court rules. *See* Iowa R. Crim. P. 2.61(2). Our tradition of the right to counsel is simply broader than that represented by *Scott* and *Nichols*.

The *Scott* fear of exposing state's to unspecified expense simply does not apply in Iowa.

4. *Overruling* Allen. In order to reach the conclusion that under article I, section 10, a person charged with a misdemeanor offense that authorizes imprisonment has the right to the assistance of counsel, we must consider *Allen*. We see no basis for distinguishing *Allen* from the present case, and we must therefore squarely address the question of whether *Allen* should be overruled.

We answer that question in the affirmative for a number of reasons. The *Allen* court did not consider the sweeping language of the "all criminal prosecutions" clause or the more limited "cases" clause of article I, section 10. *Allen* did not recognize that *Scott* was an outlier from the prior right-to-counsel cases that emphasized the role of counsel in ensuring fairness and reliability in criminal prosecutions and that the federalism and pragmatic concerns cited in *Scott* are wholly irrelevant to the interpretation of the Iowa Constitution. In particular, the *Allen* court did not recognize the fact that forty years ago, no doubt in response to *Gideon*, the Iowa legislature had provided for appointed counsel in all cases involving the "possibility of imprisonment" and this standard was incorporated into this court's rules. The *Allen* court also did not recognize that the fairness and reliability concerns regarding uncounseled misdemeanor convictions are particularly acute given the pressures inherent in the misdemeanor docket. Finally, the *Allen* court did not see the inconsistency of an approach that refused to allow an uncounseled misdemeanor conviction to support one day in jail because of concerns about the fairness and reliability of the process, but then allowed the same conviction to be used to substantially increase incarceration through later application of an enhancement statute.

In sum, we overrule *Allen.* We conclude that under article I, section 10 of the Iowa Constitution, an accused in a misdemeanor criminal prosecution who faces the possibility of imprisonment under the applicable criminal statute has a right to counsel. When a right to counsel has not been afforded, any subsequent conviction cannot be used as a predicate to increase the length of incarceration for a later crime.

## IV. Conclusion.

For the above reasons, the decision of the district court is reversed and the case remanded to the district court for further proceedings.

**REVERSED AND REMANDED.**

Cady, C.J., and Wiggins and Hecht, JJ., join this opinion. Mansfield, J., files a separate concurring opinion in which Waterman and Zager, JJ., join. Zager, J., files a separate concurring opinion in which Waterman and Mansfield, JJ., join.

**MANSFIELD, Justice (concurring specially).**

I too would vacate Young's enhanced sentence, but I cannot join the court's opinion. Following a lengthy discussion, the court concludes as a matter of Iowa constitutional law that "an accused in a misdemeanor criminal prosecution who faces the possibility of imprisonment under the applicable criminal statute has a right to counsel." This discussion and conclusion are unnecessary. The Iowa Rules of Criminal Procedure *already grant such a right.* Rule 2.61(2) provides, "In cases where the defendant faces the possibility of imprisonment, the court shall appoint counsel for an indigent defendant . . . ." Iowa R. Crim. P. 2.61(2). Why are we not deciding this case based on the text of the rule?

Rule 2.61(2) is the defendant's first line of argument. Young devoted four and a half pages to this argument, making it her initial brief point. She also wrote, "This Court will avoid unnecessary constitutional questions by addressing those issues that are not of a constitutional nature first." I believe Young's statement is correct.

Time and again, in recent years, we have proclaimed our adherence to the doctrine of constitutional avoidance. *See Hawkeye Land Co. v. Iowa Utils. Bd.*, 847 N.W.2d 199, 219 (Iowa 2014); *State v. Iowa Dist. Ct.*, 843 N.W.2d 76, 85 (Iowa 2014); *Mall Real Estate, L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 200 (Iowa 2012); *L.F. Noll Inc. v. Eviglo*, 816 N.W.2d 391, 398 (Iowa 2012); *Simmons v. State Pub. Defender*, 791 N.W.2d 69, 73–74 (Iowa 2010).

But the principle is hardly a new one. *See Hines v. Ill. Cent. Gulf R.R.*, 330 N.W.2d 284, 286 (Iowa 1983) ("As previously indicated, we do not reach the merits of these constitutional claims. We consider

constitutional issues on appeal only when another question is not decisive."); *Cmty. Lutheran Sch. v. Iowa Dep't of Job Serv.*, 326 N.W.2d 286, 291–92 (Iowa 1982) ("We avoid constitutional issues except when necessary for disposition of a controversy."); *Ehlinger v. Mardorf*, 285 N.W.2d 27, 28 (Iowa 1979) ("Although plaintiff asserts the trial court erred on both statutory and constitutional grounds, we consider only the statutory ground because we find it is determinative of the case. We have long held we will not consider a constitutional question on appeal when another question is decisive."). One of our decisions makes this point rather elegantly:

> However, we are constrained by our principles of self-restraint, including the longstanding rule that we will not decide constitutional questions when a case can be resolved on other grounds. *See, e.g., Dubuque & D.R. Co. v. Diehl*, 64 Iowa 635, 640, 21 N.W. 117, 120 (1884) ("We will not decide a constitutional question, unless it be necessarily involved in the case, which cannot be disposed of without the decision of such question. If the record shows other questions which are decisive of the case, they alone will be considered. Courts are slow in approaching, and hesitate to decide, constitutional questions.")[, *overruled on other grounds by Vandewater v. Chi., Rock Island & Pac. Ry.*, 170 Iowa 687, 695, 153 N.W. 190, 194 (1915)]; *accord State v. Button*, 622 N.W.2d 480, 485 (Iowa 2001); *State v. Quintero*, 480 N.W.2d 50, 51 (Iowa 1992). Such judicial restraint is an essential component of our system of federalism and separation of powers. *See generally* 16 Am. Jur. 2d *Constitutional Law* §§ 115–128 (1998); Lisa A. Kloppenberg, *Avoiding Constitutional Questions*, 35 B.C. L. Rev. 1003 (1994). Moreover, we recognize the law to be an evolving process that often makes the resolution of legal questions a composite of several cases, from which appellate courts can gain a better view of the puzzle before arranging all the pieces. The wisdom of this process has been revealed time and again, and we continue to subscribe to it today.

*State v. Williams*, 695 N.W.2d 23, 30 (Iowa 2005).

I fail to understand why we are ignoring that doctrine here and reaching out to decide a state constitutional question unnecessarily. The

majority contends that prior deprivation of the right to counsel *contrary to a rule* cannot serve as the ground for attacking an enhancement. There are several problems with the majority's position.

In the first place, the State has not made this argument. The State's only response to Young's rule 2.61(2) argument has been to disagree with Young's interpretation of the rule. The State does not maintain that a prior violation of the right to counsel afforded by rule 2.61(2) is an insufficient basis for challenging an enhancement. Thus, the majority is making its own argument for the State (although one I doubt the State wants made).

Second, the cases cited by the majority do not support its position. They do not address whether denial of the right to counsel in violation of a rule can serve as the basis for an attack on a later enhancement—the issue presented here. Rather, they address whether the enhancement can be attacked based on violations *other than* denial of the right to counsel. *See, e.g., State v. Johnson*, 38 A.3d 1270, 1272, 1276 (Me. 2012) (refusing to invalidate enhancement based on earlier allegedly faulty guilty plea colloquy where the defendant had been represented).

In fact, the only out-of-state decisions that are on point go the other way. *See State v. Hrycak*, 877 A.2d 1209, 1218 (N.J. 2005); *Brisson v. State*, 955 P.2d 888, 891–92 (Wyo. 1998). In *Hrycak*, the New Jersey Supreme Court decided that it would invalidate enhancements based on prior uncounseled misdemeanor convictions under principles of "the sound administration of justice" and "our [the New Jersey] Court Rules." *See Hrycak*, 877 A.2d at 1214–16 (internal quotation marks omitted). The plain language of our rule 2.61(2) supports the same approach here.

Likewise, in *Brisson*, the Wyoming Supreme Court held that an uncounseled conviction in violation of a Wyoming *statute* could not serve as the basis for a later enhancement. *See Brisson*, 955 P.2d at 891. Thus, *Brisson*—like *Hrycak*—follows an approach similar to the one I would follow here.

Third, the majority's invocation of judicial restraint is curious—and just plain backwards. The majority maintains it would go too "far" to remedy a rule-based denial of counsel, so the court is "required to proceed" under the Iowa Constitution. This inverts traditional notions of judicial restraint. Suppose we adopted Young's primary argument based on the plain language of rule 2.61(2). Then the legislature could potentially modify or reverse our ruling if it disagreed with it. But because the majority has decided to fly solo under the Iowa Constitution, and overrule our 2005 precedent without the benefit of meaningful adversarial briefing, the legislature is stuck with our ruling absent a constitutional amendment (or a change of heart from this court).

Another very good reason to exercise restraint here is that Young has provided only a minimal, bare-bones state constitutional argument. The gist of Young's position is that we should interpret the Iowa Constitution "more stringently." I quote her article I, section 10 argument in its entirety:

> *More stringent analysis under the Iowa Constitution.* "Even where a party has not advanced a different standard for interpreting a state constitutional provision," our Supreme Court "may apply the [federal] standard more stringently than federal case law." *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011). *See also State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009). Our Supreme Court has previously rejected the argument that the Iowa Constitution should be interpreted more stringently than the federal constitution in the right-to-counsel context. *State v. Allen*, 690 N.W.2d 684, 690 (Iowa 2005).

> Since the Allen decision, our supreme court has applied a more stringent analysis in the context of search and seizure and cruel and unusual punishment. *See e.g., State v. Baldon*, 829 N.W.2d 785, 791 (Iowa 2013) (noting that the federal constitution "makes for an admirable floor, but it is certainly not a ceiling"); *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012) (reiterating that Iowa courts utilized a more stringent review than federal courts in the context of cruel and unusual punishment); *State v. Ochoa*, 792 N.W.2d 260, 291 (Iowa 2010) (rejecting the federal approach to warrantless searches of parolees). The court should consider doing the same under the right-to-counsel analysis.

Arguing that we *can* interpret the Iowa Constitution differently is not the same as presenting an independent constitutional argument. While today's opinion displays considerable workmanship, it would not be fair to characterize it as the outcome of an adversarial litigation process.

Even if we have to reach the constitutional issue, which we do not, then I wonder why we are overruling *State v. Allen*, 690 N.W.2d 684 (Iowa 2005). We decided *Allen* unanimously less than a decade ago. There we discussed (albeit in a shorter opinion) a number of the same federal and out-of-state precedents the court discusses today. *Id.* at 687–88, 690–91. We also relied on several state constitutional precedents the court does *not* mention today. *Id.* at 690; *see People v. Reichenbach*, 587 N.W.2d 1, 4–7 (Mich. 1998) (finding no right to counsel for misdemeanor defendants under the Michigan Constitution absent actual imprisonment); *State v. Woodruff*, 951 P.2d 605, 616 (N.M. 1997) (finding no right to counsel for misdemeanor defendants under the New Mexico Constitution absent actual imprisonment). Reading *Allen* today, I think that ten-year-old decision stands the test of time.

My colleagues' rhetoric about *Allen* is harsh: "Remarkably, we did not cite," "mimicked," "apparently not familiar," "contains no discussion at all," "fundamentally flawed." This harshness in describing a unanimous decision of this court is unwarranted. I believe this court in

2005 understood how the criminal justice system operates in the real world.[2]

The majority also asserts that "the *Allen* court did not have the benefit of the Florida case declining to follow *Nichols*." *See State v. Kelly*, 999 So. 2d 1029, 1048–49 (Fla. 2008). Interested readers can peruse *Kelly* for themselves and decide whether it is a game-changer. I think not. *Kelly* was decided under the Florida Constitution, whose right to counsel guarantee is framed somewhat differently than the right to counsel in the Sixth Amendment or article I, section 10 of the Iowa Constitution. *See id.* at 1050. Regardless, the reliability consideration that propelled the Florida Supreme Court's *Kelly* decision is one we expressly considered, and rejected, in *Allen*. *See Allen*, 690 N.W.2d at 691–92.[3]

---

[2]The majority also maintains that the *Allen* court erred in observing that the Sixth Amendment and article I, section 10 are "textually similar." *See Allen*, 690 N.W.2d at 690. In fact, they are. Both provisions apply to "all criminal prosecutions." *Compare* Iowa Const. art. I, § 10, *with* U.S. Const. amend. VI. Article I, section 6 also covers another category of cases, namely, "cases involving the life, or liberty of an individual." Iowa Const. art. I, § 10. As noted by the majority, the contemporary debates indicate this provision was meant to protect persons claimed to be subject to return as fugitive slaves. *See* 2 *The Debates of the Constitutional Convention of the State of Iowa* 736–41 (W. Blair Lord rep., 1857), *available at* www.statelibraryofiowa.org/services/collections/law-library/iaconst.

[3]In addition, the majority mentions Hawaii and North Dakota constitutional precedent that preceded *Allen*. *See State v. Sinagoga*, 918 P.2d 228, 242 (Haw. Ct. App. 1996), *overruled in part on other grounds by State v. Veikoso*, 74 P.3d 575, 582 n.8 (Haw. 2003); *State v. Orr*, 375 N.W.2d 171, 177–79 (N.D. 1985). However, Hawaii's Constitution expressly provides, "The State shall provide counsel for an indigent defendant *charged with an offense punishable by imprisonment*." Hawaii Const. art. I, § 14 (emphasis added). Therefore, *Sinagoga* is hardly a relevant precedent here. As the North Dakota Supreme Court noted in *Orr*, the wording of North Dakota's constitution also differs from that of the Sixth Amendment. *See* 375 N.W.2d at 177. Regardless, *Allen*'s observation remains true that "[a] strong majority of the states that have analyzed uncounseled misdemeanor convictions under their state constitutional rights to counsel and due process have declined to forge new and different ground." 690 N.W.2d at 690.

Finally, let me address one other matter. We have previously held the right to counsel can be waived in a written plea that includes a waiver of counsel. *See State v. Majeres*, 722 N.W.2d 179, 182–83 (Iowa 2006). That did not occur here. Nothing the court has said today affects the *Majeres* holding.

For the reasons indicated, I would vacate Young's enhancement because the prior uncounseled misdemeanor conviction did not comply with rule 2.61(2) and Young did not waive the rule's requirements.

Waterman and Zager, JJ., join this special concurrence.

**ZAGER, Justice (concurring specially).**

I too would vacate Young's enhanced sentence predicated on her prior, uncounseled plea to a simple misdemeanor. Further, I would follow Justice Mansfield's special concurrence's reasoning and vacate the sentence based on Iowa Rule of Criminal Procedure 2.61(2), which by its plain language answers the question: "In cases where the defendant faces the possibility of imprisonment, the court shall appoint counsel for an indigent defendant . . . ." I write separately to emphasize the need for district courts to adequately inquire into and document both the State's intentions of requesting imprisonment and a defendant's intention to waive counsel.

In this case, the record is devoid of any record of the initial appearance for the prior misdemeanor. Correspondingly, it is devoid of any record of the State's intentions of requesting imprisonment or whether the right to counsel was communicated to the defendant.[4] As our rules properly note, an important inquiry at this stage of the criminal proceedings is whether the State will be requesting imprisonment because of the charge. *See* Iowa R. Crim. P. 2.61(2); *accord State v. Majeres*, 722 N.W.2d 179, 182 (Iowa 2006) ("At all critical stages of the criminal process, the Sixth Amendment affords an accused *facing incarceration* the right to counsel." (Emphasis added.)). If the State will

---

[4]Here, we deal with the right to counsel in the context of a simple misdemeanor. Of course, attachment of the right to counsel is different when a defendant is charged with an indictable offense. *See State v. Nelsen*, 390 N.W.2d 589, 591 (Iowa 1986) (holding when the right to counsel attaches depends on when adversary proceedings are "commenced" by reference to state law). In either case, however, a defendant may waive his or her right to counsel. *See State v. Marjeres*, 722 N.W.2d 179, 182 (Iowa 2006) ("Although a defendant has such a right to counsel, a defendant can choose to waive the right to counsel.").

be requesting imprisonment, the right to counsel attaches. If not, it doesn't. This fact is readily determined through judicial inquiry of the State and should be noted in the initial appearance record.

Likewise, even if the right to counsel attaches, a defendant may waive his or her right to be represented by counsel. *Majeres*, 722 N.W.2d at 182 ("Although a defendant has such a right to counsel, a defendant can choose to waive the right to counsel."). As with the State's intention to pursue imprisonment, a defendant's intention to waive the right to counsel can be readily determined by the district court communicating that right to the defendant and asking: "Do you want to waive your right to counsel?" This fact should also be noted in the initial appearance record.

While I am confident the district court made these inquiries when the defendant appeared for her initial appearance, we have no record of this. Consequently, this case highlights the need for district courts to inquire into and document both the State's intention to request imprisonment and a defendant's intention to waive counsel. As this case illuminates, failure to do so can significantly affect future prosecutions. On the other hand, the simple step of inquiring into and documenting these matters ensures that enhanced sentences are upheld on appeal when otherwise appropriate.

Waterman and Mansfield, JJ., join this special concurrence.