# IN THE COURT OF APPEALS OF IOWA

No. 23-0905
Filed July 24, 2024

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**OSBORN EUGENE GAVEL,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Hardin County, Jennifer Miller, Judge.

A defendant appeals his conviction for first-degree murder. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Bridget A. Chambers (until withdrawal) and Benjamin Parrott, Assistant Attorneys General, for appellee.

Considered by Tabor, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Osborn Gavel killed Steve Reece by bludgeoning him over the head repeatedly with a crowbar. Now on appeal from his subsequent first-degree murder conviction, Gavel argues there was insufficient evidence presented by the State that he had the necessary specific intent so the case should be remanded for entry of judgment on the lesser-included crime of second-degree murder. As a second challenge, Gavel also asserts that the district court should have allowed him to depose the State's rebuttal expert witness on his defense of diminished responsibility and that error requires dismissal of his case or a new trial. We affirm the conviction.

**I. Background Facts and Prior Proceedings.**

In October 2021, Elizabeth Briseno met Gavel at a hotel in Polk County where the pair used methamphetamine and drank with Briseno's friend and two other women. Briseno had not interacted with Gavel before, but she invited him back to Reece's house in Union where she was renting a room. Gavel drove Briseno's car and they—along with Gavel's dog—arrived very early the next morning. When he met them, Reece was scared of the dog, and he told Briseno that both Gavel and the dog needed to leave his house as soon as possible. Briseno agreed to drive them back to Polk County the next day, and Reece agreed that they could stay the night. At some point, Briseno brought a crowbar in from the garage to open something.

Everyone went to bed early that night—Briseno, Gavel, and his dog in the living room, and Reece in his room. During the night, Briseno awoke to Reece in the kitchen getting a snack. He asked Briseno where the TV remote was and then

went back to sleep in his room. Gavel was also grabbing a snack and interacted with Briseno and Reece without incident. However, when Briseno and Gavel laid back down in the living room, Gavel asked Briseno if Reece had ever hurt her. Briseno said no. At some point, Gavel took the crowbar and hid it in the leg of his pants.

Awakened from her sleep, Briseno heard "a bang, like a piece of wood, like something hit hard." She asked Gavel where he was, to which he responded that he took care of it, adding "I took care of the man. He won't hurt you no more." When Briseno realized that Gavel was referring to Reece, she went into Reece's bedroom and saw "blood on his face," which was "smashed." After looking for and finding that Gavel had her cell phone in his pocket, Briseno asked Gavel to return the phone. Gavel refused, insisting to Briseno "it's not my fault. . . . It's, like, self-defense. We can pretend it's like self-defense and you can run with me, run with [me] away from the house in [your] car." He again suggested that Briseno run away with him and his dog and again asked if Reece had ever sexually assaulted or harmed her. She denied Reece being anything but a mentor and best friend to her. Gavel repeated that he intended to run away, but Briseno responded that Gavel would not get away.

Briseno, who got her phone from Gavel, called 911 and told the operator, "I was sleeping and I woke up." She asked emergency services to hurry and then detailed, "He killed the gentleman." Briseno explained that "the gentleman thought he was going to hurt me. He never hurt me." She also told the operator that Reece had blood on his face, was not breathing, and had no pulse. While Briseno was on the phone with the 911 operator, Gavel took multiple photographs of Reece's

house and items in it, including a crawl space, clothing, a picture of a girl in a white dress, a child's backpack with ten dollars in it, and a box of Pokémon cards with a number on the side. Gavel searched the number on Google and found that it corresponded to a website selling saris, which included a picture of a female adolescent.

When emergency medical technicians (EMTs) reached the house, they addressed Gavel who was sitting on the stoop with his dog. One of the EMTs was struck that Gavel "was very matter of fact when responding to me, calm and straightforward. Did not seem agitated at all to me." Inside the house, Briseno was frantic and crying and told EMTs that Reece "never raped or forced sex on me." She also said, "I don't know why he would hit him with that crowbar." EMTs found a crowbar laying on the carpet in the hallway and Reece lying in bed with severe head trauma and bleeding. He also had a "large pooling of blood around his body," and there were blood splatters on the lamp sitting on the nightstand and the bedroom wall. Reece was pronounced dead at the scene.

Once law enforcement arrived, Grundy County Sheriff's Deputy Carson Lutterman[1] walked up to Gavel, who was still sitting on the stoop. Deputy Lutterman described the interaction with Gavel as Gavel being "calm. He had no trouble following any of my directives, no trouble walking up to me. He allowed me to place handcuffs on him." While interacting with Deputy Lutterman, Gavel mentioned Pokémon cards. He also mentioned that he was recording with his cell phone; Deputy Lutterman found the cell phone on the stoop and confirmed that it

---

[1] Deputy Lutterman also serves as an Eldora, Iowa police officer.

had been recording for fifteen minutes, beginning just after Briseno called 911. Deputy Jeff Brenneman transported Gavel to jail.

Once at the jail, Gavel called his grandmother. He told her that he went with Briseno to her house to shower and sleep, but Briseno was part of a sex trafficking ring and that there was "this old man that was keeping [Briseno] there." Referring to Reece he added, "I ended up killing the dude. Ended up killing him and waiting for the cops to show up." He explained that the charges he was facing could be influenced by evidence he discovered including "the clothes and all that shit and the Pokémon cards with the number on it for the chick that was bought." When his grandmother asked, "You killed this guy?" Gavel responded, "Yeah, I killed him." When she asked why, Gavel answered that he woke up and Reece was standing over him staring at him and after Gavel's dog started puking, Gavel thought Reece poisoned the dog. He concluded that "no more women and children are getting hurt by that guy." Gavel thought Reece might kill him, so, Gavel explained, he "hit [Reece] four times with a crowbar."

The State charged Gavel with first-degree murder, a class "A" felony, in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2021).

Gavel filed a notice of diminished responsibility defense, stating that he intended to call Dr. Tracy Thomas "as an expert witness in furtherance of said defense." A year after Gavel killed Reece, Dr. Thomas evaluated him. Just before trial, Dr. Rosanna Jones-Thurman also interviewed Gavel on behalf of the State. That same week, Gavel moved to compel a deposition of Dr. Jones-Thurman twelve days before trial and four days after the court's own discovery deadline. The State resisted. Following a hearing, the district court ruled that "Gavel is not

authorized by the [Iowa Rules of Criminal Procedure] to depose the State's rebuttal witness. The State disclosed Dr. Jones-Thurman's name to . . . Gavel as its potential rebuttal psychologist expert before Dr. Jones-Thurman evaluated [him,] which is all that is required . . . ." The court denied the motion to compel the deposition. During jury selection, Gavel moved again to compel a deposition of Dr. Jones-Thurman, and the court declined to reconsider its ruling denying the motion.

At trial, Gavel called Dr. Thomas. She testified that she holds a doctorate in clinical psychology and had reviewed body camera footage, the trial information, the jail phone calls, Gavel's photographs of Reece's house, and the minutes of testimony in this case. She also had examined Gavel. In her opinion, Gavel "met the definition in the Iowa case law of having diminished responsibility" because he had a fixed delusion that "Reece was in charge of this big sex trafficking operation, [and] that the woman in the house . . . Briseno, was also involved. That he needed to save her." Dr. Thomas explained that Gavel believed that the Pokémon cards that Gavel had found and photographed "had some meaning, that they were actually some code for sex trafficking, and different people that were being sex trafficked." Dr. Thomas added that Gavel believed that the clothing "belonged to children and women and girls that he assumed had been sex trafficked" and that the picture of the young girl in the white dress and the child's backpack with ten dollars were secret messages. Furthermore, she explained that Gavel "was very much trying to get the police to investigate further because he was convinced that this was a sex trafficking ring." She opined that the calmness Gavel exhibited with the authorities showed he was delusional in the face of having just killed Reece.

Lastly, Dr. Thomas opined that the fixed delusion could be the result of Gavel being "acutely high" from his methamphetamine use with Briseno in the Polk County hotel and his long-term drug use.

The State called Dr. Jones-Thurman on rebuttal. Dr. Jones-Thurman, who also holds a doctorate in clinical psychology, reviewed the same documents, photos, and video from the case file that Dr. Thomas had reviewed. She also examined Gavel. Dr. Jones-Thurman concluded that Gavel "was capable of intent, following through with that intent." When asked how she formulated that opinion, Dr. Jones-Thurman explained that immediately after killing Reece, Gavel "was calm. He was cooperative. He didn't offer a lot of information, but he was calm, cooperative, gave [law enforcement] his name, his date of birth." Regarding Briseno, Dr. Jones-Thurman added that "he asked her to lie about . . . Reece raping her." Furthermore, Gavel "went around taking some pictures of some things at the house afterward as well, so my opinion is that obviously these were things that he was doing to try and come up with a story, if you will, of what happened." Dr. Jones-Thurman agreed with Dr. Thomas that Gavel most likely has "a methamphetamine dependence problem" but rejected Dr. Thomas's determination that Gavel "had any type of psychosis or delusional disorder." Instead, she determined that Gavel was capable of forming specific intent at the time he killed Reece.

The jury found Gavel guilty as charged. Gavel moved for a new trial, arguing that the verdict was contrary to the law and evidence because Dr. Thomas testified that Gavel's delusions prevented him from forming specific intent and, in his view, Dr. Jones-Thurman never disputed that testimony; Gavel also argued that

the court erred in not ordering the State to produce Dr. Jones-Thurman for a deposition prior to trial. The State resisted. After a hearing, the court denied the motion and sentenced Gavel to life in prison with no possibility of parole. Gavel appeals.

## II. Discussion.

Gavel raises two claims of error. First, he asserts that he presented substantial evidence that he was not capable of forming the specific intent to kill Reece and asks that we vacate his conviction and remand for an entry of judgment on second-degree murder. Second, he argues that the district court both erred and abused its discretion in failing to compel a deposition of Dr. Jones-Thurman and asks that we remand this case for a new trial or dismiss it.

### A. Sufficiency of the Evidence.

We review the sufficiency of the evidence supporting convictions for correction of errors at law. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We affirm when the verdict is supported by substantial evidence, meaning "the quantum and quality of evidence is sufficient to 'convince a rational fact finder that the defendant is guilty beyond a reasonable doubt.'" *State v. Banes*, 910 N.W.2d 634, 637 (Iowa Ct. App. 2018) (citation omitted). In conducting our review, we consider "the evidence in the light most favorable to the [verdict], including all reasonable inferences that may be fairly drawn from the evidence." *Id.*

Because unchallenged jury instructions become the law of the case for purposes for our review of sufficiency of the evidence, *State v. Schiebout*, 944 N.W.2d 666, 671 (Iowa 2020), to find Gavel guilty of first-degree murder, the jury had to conclude:

1. [Gavel] struck [Reece] with a crowbar.
2. [Reece] died as a result of being struck.
3. [Gavel] acted with malice aforethought.
4. [Gavel] acted willfully, deliberately, premeditatedly and with a specific intent to kill [Reece].

Gavel does not dispute that he struck and killed Reece with a crowbar.

Instead, Gavel argues that because of delusions he experienced he was unable to act willfully, deliberately, premeditatedly, and with a specific intent to kill Reece, and he again raises a diminished responsibility defense. *See* Iowa Code § 701.4. The doctrine of diminished responsibility is recognized in Iowa as a matter of common law. *See Anfinson v. State*, 758 N.W.2d 496, 502 (Iowa 2008). "The diminished responsibility defense allows a defendant to negate the specific intent element of a crime by demonstrating due to some mental defect she did not have the capacity to form that specific intent." *Id.* Here, the jury was instructed that "'[d]iminished responsibility' means a mental condition which does not allow the person to form a premeditated, deliberate, specific intent to kill." Furthermore, the jury was told it should "determine from the evidence if [Gavel] was capable of premeditating, deliberating, and forming a specific intent to kill." On this issue of diminished responsibility, the jury heard a battle of the experts, with Drs. Thomas and Jones-Thurman testifying to opposite conclusions; the jury was instructed to "[c]onsider expert testimony just like any other testimony," "accept it or reject it," and "give it as much weight as you think it deserves, considering the witness' education and experience, the reasons given for the opinion, and all the other evidence in the case." Gavel argues Dr. Jones-Thurman "did not effectively undermine Thomas' testimony" and that this is the "rare case where the overwhelming evidence presented at trial substantiates that [Gavel] was suffering

from diminished responsibility and did not have the requisite ability to premeditate, deliberate, or form specific intent."

But, the jury did hear testimony that Gavel could have had the requisite specific intent, so Gavel's argument comes down to the position that the jury should have believed his expert witness over the State's. It is not our role on appeal "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005) (citation omitted); *accord State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) (noting the jury is free to believe or disbelieve any evidence and to give weight to the evidence as it sees fit). This is so because "[i]nherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006) (citation omitted); *accord State v. Shorter*, 945 N.W.2d 1, 10 (Iowa 2020) ("[T]he jury can believe some of a witness's story while rejecting other parts."). This rule holds true for determining which expert to credit. *See State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000) ("When conflicting psychiatric testimony is presented to the fact finder, the issue of sanity is clearly for the fact finder to decide."); *accord State v. Sanchez*, No. 14-1497, 2015 WL 8388417, at *5 (Iowa Ct. App. Dec. 9, 2015) ("Faced with these diametrically opposed expert opinions, the jury was free to believe whomever they wished.").

Viewing the evidence in the light most favorable to the verdict, and leaving credibility determinations for the jury, the State presented substantial evidence here to support the finding that Gavel acted with specific intent and to reject his

diminished responsibility defense. Dr. Jones-Thurman testified that Gavel was capable of forming the specific intent to kill Reece and to act willfully, deliberately, premeditatedly while doing so. She reached that conclusion by considering that Gavel only began formulating a story about what happened that night after he had already killed Reece: asking Briseno to help him get away, taking her cell phone, instructing her to lie and state that Reece was sexually assaulting her, taking pictures, searching the numbers on the Pokémon cards online, recording his interactions with police, and sitting on the stoop and waiting with his dog. He also acted calmly and was cooperative with both EMTs and law enforcement. The jury credited Dr. Jones-Thurman's testimony that such actions demonstrated that Gavel was not delusional, as it is the jury's province to do. Thus, we affirm on this issue.

**B. Deposition of Rebuttal Expert Witness.**

Gavel maintains he had a right to depose the State's expert rebuttal witness under the authority of Iowa Rule of Criminal Procedure 2.13(1) in conjunction with Iowa Rule of Civil Procedure 1.508. Framing the issue as discovery of competing experts, Gavel argues the deposition of the State's expert falls into the category of individuals that can be deposed. We review discovery decisions for abuse of discretion. *Fenceroy v. Gelita USA, Inc.*, 908 N.W.2d 235, 241 (Iowa 2018) (including a motion to compel deposition as a discovery decision). We will reverse only when the district court exercises its discretion on grounds that are clearly untenable or unreasonable. *Mediacom Iowa, L.L.C. v. City of Spencer*, 682 N.W.2d 62, 66 (Iowa 2004). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application

of the law." *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000). However, we review the interpretation of the Iowa Rules of Criminal Procedure for correction of errors at law. *Ashenfelter v. Mulligan*, 792 N.W.2d 665, 668 (Iowa 2010) (distinguishing between the review of discovery decisions and the review of interpretation of statutes); *State v. Young*, 863 N.W.2d 249, 252 (Iowa 2015) ("In interpreting the Iowa Rules of Criminal Procedure, our review is for correction of errors at law.").

Turning to Gavel's contention, Iowa Rule of Criminal Procedure 2.13(1) permits a defendant in a criminal case to "depose all witnesses listed by the state on the indictment or information or notice of additional witnesses in the same manner and with like effect and with the same limitations as in civil actions except as otherwise provided by statute and these rules." Rule 2.11(11)(b)(2) adds the additional requirement that the State disclose the name of any state-named expert prior to that expert's examination of the defendant. To further bolster his argument, Gavel turns to Iowa Rule of Civil Procedure 1.508(1)(a), which permits that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial." Using this language, Gavel asserts once the State discloses its expert, under both the criminal and civil rules of procedure, a party should be able to depose that competing expert. The State argues that because it was not required to identify rebuttal witnesses, like Dr. Jones-Thurman, in the minutes of testimony, *see Greiman v. State*, 471 N.W.2d 811, 813 (Iowa 1991), or in the notice of additional witnesses, Gavel has no right to a deposition of the State's rebuttal witness—whether the witness is an expert or not. More

specifically, Iowa Rule of Criminal Procedure 2.13(1) did not permit Gavel to depose her. *See State v. Tangie*, 616 N.W.2d 564, 572 (Iowa 2000).

We side with the State on this issue. First, as it relates to discovery in a criminal case, our supreme court has "been scrupulous not to broaden discovery beyond the plain language of the rules or statutes." *State v. Rainsong*, 807 N.W.2d 283, 287 (Iowa 2011), *accord id.* at 287–88 (setting out examples of discovery provisions applicable to criminal cases, including the clear holding of *Tangie*). With the benefit of existing authority, the district court did not abuse its discretion in denying Gavel the opportunity to depose the expert rebuttal witness, Dr. Jones-Thurman. We also find that it did not err in its interpretation of Rule 2.13(1), and thus we reject Gavel's challenge.[2]

Because the State presented substantial evidence that Gavel acted willfully, deliberately, premeditatedly and with a specific intent to kill Reece when he struck him four times with a crowbar and the district court did not err in interpreting our rules of criminal procedure to not require ordering deposition of a rebuttal expert witness nor abuse its discretion in denying Gavel's motion to compel, we affirm Gavel's conviction.

**AFFIRMED.**

---

[2] In the alternative, the State also argued that Gavel's motion to compel discovery was untimely. *See* Iowa R. Crim. P. 2.11(4) (requiring that pretrial motions be filed no later than forty days after arraignment but allowing the court to establish its own deadlines for filing motions). However, since we find that the court's denial of that motion does not afford Gavel relief, we do not address the State's timeliness argument.